WHITFIELD BRYSON & MASON, LLP
MATTHEW E. LEE (*to be admitted pro hac*)
(matt@wbmllp.com)
JEREMY R. WILLIAMS (*to be admitted pro hac*)
(jeremy@wbmllp.com)
900 W. MORGAN STREET
RALEIGH, NC 27603
Telephone:     (919) 600-5000
Facsimile:     (919) 600-5035

RAFKIN ESQ., PLLC
SETH A. RAFKIN (199166)
(srafkin@rafkinesq.com)
JENNIFER M. BOGUE (259431)
(jbogue@rafkinesq.com)
1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ  07869
Telephone:     (973) 891-3370
Facsimile:     (973) 920-9727

Attorneys for PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. _____

| | | |
|---|---|---|
| JEROME BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Jerome Beard, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

## **INTRODUCTION**

1.     This case comes down to one thing: IBM doesn't pay what it owes to sales representatives. In this case, IBM discriminated against Jerome Beard based on his race when it

1

paid similarly situated white employees full commissions but not him; and IBM illegally capped Mr. Beard's commissions in order to limit his income, directly contrary to their promises to him.

2.       For years, IBM has perpetrated an institutional bait-and-switch with how it pays commissions to sales representatives. Throughout IBM's messaging to them, from how it directs managers to explain commissions to how it uses presentations to cover the program features, IBM consistently and repeatedly represents that commissions are uncapped. Indeed, IBM's Rule 30(b)(6) witness admitted under oath in a deposition in a similar lawsuit that IBM has "an obligation" not to cap sales representatives' commissions payments, and that it is reasonable for sales representatives to rely on those representations.

3.       IBM tells sales representatives that "[they] can make a million dollars!" and that their income is limited only by how much they are able to sell. But that's not the truth. The truth is that IBM frequently does cap commissions.

4.       IBM intentionally misleads sales representatives about the program because it knows that an "uncapped commissions" program is highly motivating to sales representatives and incentivizes them to pursue big deals. On the contrary, capping commissions de-motivates sales representatives because when they reach the cap they can't earn any more commissions no matter how big the deal is. And, since a big deal is often extraordinarily difficult to close, requiring long hours and repeated out-of-town travel, IBM knows that being honest about its capped commissions program would significantly limit the number of those big deals.

5.       For years, IBM has known that sales representatives, and even managers, believe IBM when it says commissions are uncapped. In fact, the IBM department that handles capping frequently gets calls from sales representatives and managers that are upset about getting capped after being told that IBM does not cap commissions. Yet, IBM does nothing to attempt to eliminate the problem by explaining its real practice.

PLAINTFF'S COMPLAINT

6.      The reason IBM doesn't attempt to explain that it caps commissions is simple: profit. As it stands, IBM is able to have its cake and eat it too because it can successfully motivate its sales team to pursue the big deal for IBM, but never have to pay a fair commission for the extraordinary effort the sales representative expended to close it.

7.      Worse, in this case, IBM discriminated against Plaintiff Jerome Beard, an African-American, because of his race.  IBM paid two white sales representatives full, uncapped commissions on substantially similar deals but drastically cut what it owed to Mr. Beard.

8.      MR. Beard is another victim of IBM's blatantly unlawful commission practices. He has filed this action to recover the damages he's incurred from IBM's wrongful capping of his sales commissions and to stop IBM's deceptive, discriminatory and unlawful practices.

## PARTIES

9.      Mr. Beard is a citizen of Danville, California residing in Contra Costa County.

10.     IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

12.     The parties are citizens of different states. Mr. Beard is a citizen of California and resides in Contra Costa County.  IBM is a citizen of New York.  Among other damages, the amount of earned compensation that IBM failed to pay Mr. Beard exceeds $2.4 million. Accordingly, the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over IBM.  Mr. Beard works for IBM in California and IBM denied him wages due and owing in California.  Moreover, IBM maintains offices in California and regularly conducts business in the state.

3

PLAINTFF'S COMPLAINT

14.     Venue is proper in this Court.  Mr. Beard has resided in this District during the time relevant to this complaint and a substantial part of the events giving rise to the claims occurred in this district. IBM has maintained offices and conducted business in the District duing the relevant time period.

15.     This action has been brought within all applicable statute of limitations and/or repose.

### FACTUAL ALLEGATIONS

16.     Mr. Beard is a seasoned software sales representative that joined IBM soon after he graduated college in 1983.

17.     During his tenure with IBM, Mr. Beard has been a successful and highly respected sales representative.  He has exceeded his assigned sales quota every year since 2009.  He has received positive ratings in every performance review. He has received numerous awards for 100% quota club (meaning he met or exceeded his quota) and received Best of IBM top 1,000 Employees awards in 2016 and 2017.

18.     In 2017, Mr. Beard's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. He was assigned a revenue target incentive.  His commission compensation was tied to the percentage of the target incentive he attained and the commission amount that could be earned was uncapped.

19.     During his time at IBM, Mr. Beard and other sales representatives regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 slides, and are collectively referred to as the "Educational Materials."

20.     Each year, the Educational Materials explained that sales commissions are uncapped. Nowhere do the Educational Materials state, or even suggest, that sales commissions

4

are subject to being capped. The Educational Materials are unequivocal and state repeatedly that commissions are uncapped.

21.     Mr. Beard's commission plan for the second half of 2017 ran from July 1, 2017 through December 31, 2017. Several weeks into the second half of 2017, IBM sent an (electronic) document to Mr. Beard which IBM refers to as an "Incentive Plan Letter" or "IPL."

22.     During the same time period in 2017, Mr. Beard received and reviewed a presentation (the "PowerPoint") which constituted a portion of the Educational Materials for the second half of 2017. IBM also made the PowerPoint available to Mr. Beard, and other sales representatives, for download throughout the sales period (July-December 2017) and afterwards, as a resource that they could continually refer back to if they had questions about their commissions. This PowerPoint constitutes a continuing representation by IBM to sales representatives, including Mr. Beard, of the terms of their commission compensation. (IBM made a substantially similar version of this PowerPoint available to sales representatives, including Mr. Bear, each year for the purpose of explaining the important terms of his compensation.)

23.     The 2017 IBM's PowerPoint presentation begins as follows:

Welcome. This incentive plan Quickview presentation is the **primary 2017 education** for IBM sales employees and managers. **It covers the information you will need to understand your 2017 plan.**

Based on positive responses to this type of on-demand, self-service education on Incentives Workplace, we are once again delivering both manager and employee incentive plan education in this format.  In addition, managers are encouraged to hold team meetings with their employees to discuss their 2017 incentive plan and help further ensure employee understanding.

Let's get started.

(emphasis added).

24.     The PowerPoint was entitled  "Your 2017 Incentive Plan" "Individual Quota Plan (IQP) – Employees" and it stated that the goal of the incentive plan is "to ensure that our

5

PLAINTFF'S COMPLAINT

incentives plans were competitive, if not best-in class" In particular, page 10 of the PowerPoint reads as follows:



## 2017 Individual Quota Plan Highlights

- **Common worldwide pay mix**
  - 55% Base Salary, 45% Target Incentive  for sales roles
  - 70% Base Salary, 30% Target Incentive  for technical roles
- **Roles without dedicated XaaS element on Traditional Payout Table**
- Systems  HW, IGF, Cloud Services, GTS-TSS & SW Renewal Sellers
  - 1% of Target Incentive  for every 1% of quota attainment  between 25% - 100%
  - Pay accelerators above 100% attainment
  - Payments  uncapped
- **Roles with dedicated XaaS element on Progressive Payout Table**
- Software Solutions, Brand Category Leaders Dedicated to Industry Accounts or Enterprise Business Units (EBUs) and Global Markets roles
- 1% of Target Incentive  for every 1% of quota attainment  between 25% - 100%
  - Pay accelerators above 100% attainment  – gated by ACV Bookings Achievement
- **New for 2H: Extend use of Progressive Payout Table for several key roles**
- Industry  Client Leaders, EBU Leaders, GTS Services Client Reps, GTS Service Line Reps, GBS Sales Specialists
- 1% of Target Incentive  for every 1% of quota attainment  between 25% - 100%
- Pay accelerators above 100% attainment  – gated by XaaS Revenue  Achievement
  - **New for 2H: For 6 month plans, introduced minimum performance threshold of 25%**
  - Applies independently  to each element
- **Individual Challenges element weighted 15% of Target  Incentive for most roles**
- **Achievement  calculated based on year-to-date basis**
- Excludes  ICLs & EBU leaders paid on plan-to-date  methodology  due to higher thresholds

10                                                                                               IBM

Under "2017 Individual Quota Plan Highlights," each of the bullet points highlights how commissions are paid during the 2H 2017 sales period for various sales roles, with the role applicable to Mr. Beard stating clearly "**Payments uncapped**." (emphasis added). In fact, the presentation mentions no less than fourteen times in its 27 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

25.    Moreover, IBM represented to Mr. Beard and its other sales representatives that "**Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of employee contribution**." (emphasis added).

26.    These representations were repeated in sales meetings that Mr. Beard attended and by IBM managers to Mr. Beard.

PLAINTFF'S COMPLAINT

27.     Indeed, even IBM's written guidance to its managers for dealing with situations in which an adjustment may be made based on errors or other issues makes it blindingly clear that no caps are allowed:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

(emphasis added).

### Mr. Beard's Commission Payments Were Capped.

28.     In 2017, Mr. Beard worked hard to close two large IBM products and services deals with HCL America, Inc. ("HCL"). The first deal closed September 30, 2017 (the "September HCL deal"), and the second one closed December 30, 2017 (the "December HCL deal"). The revenue subject to commission generated by Mr. Beard from these deals totaled $25,200,000, with the September HCL deal composing $13,200,000 of that total amount and the remaining $12,000,000 in revenue coming from the December HCL deal.

29.     Based on these sales of $25,200,000 in commissionable revenue, Mr. Beard earned $2,901,806 in commissions from the two HCL deals. IBM, however, refused to pay him this amount, even though his managers thought he should have been paid in full and signed off on full payment to him.

30.     After the September HCL deal closed on September 30, information regarding Mr. Beard's commissions was sent to his first line manager (Greg Mount), then his second line manager (Scott Kingston), and his third line manager (Dave Mitchell) for their approval. All three approved the payment of commissions to Mr. Beard on or by October 19, 2017.

PLAINTFF'S COMPLAINT

31.     Based upon these approvals, IBM's internal commissions dashboard showed commissions earned and to be paid to Mr. Beard of approximately $1,400,000 for the September HCL deal.

32.     After all three members of Mr. Beard's management team had all approved this commission payment, and the internal commissions dashboard reflected that he would be paid in full for the September HCL deal, an individual from the finance department at IBM emailed Beard and told him that the September HCL deal was going through an additional review. Supposedly, this review was being performed with respect to all aspects of the deal, and as to all individuals who were involved in the deal to ensure accuracy. As a result of the review, Mr. Beard was informed that his payment would be delayed until the review was completed.

33.     On November 16, 2017 Mr. Beard received an email from his first line manager, Mr. Mount, informing him that IBM had concluded its review and decided it would only attribute $2,000,000 worth of credit to Mr. Beard for the September HCL deal (instead of the actual revenue of $13,200,000).

34.     In oral communications with Mr. Mount and Mr. Kingston, the only basis provided to Mr. Beard for IBM's decision to attribute only $2,000,000 worth of revenue credit to Mr. Beard was that the actual revenue credit of $13,200,000 generated a higher commission due to Mr. Beard than IBM was willing to pay him. He was not provided any substantive basis beyond that. Based on this $2,000,000 revenue credit, Mr. Beard was paid a commission of $205,286 in November 2017.

35.     While this process was playing out, Mr. Beard was hard at work trying to close a second deal with HCL for additional IBM software licenses. He successfully closed this second deal with HCL on December 30, 2017. Like the first HCL deal, this deal was the culmination of years worth of relationship building and hard work, and required significant amounts of travel

PLAINTFF'S COMPLAINT

across the country and time away from his family. When this deal closed on December 30, 2017, Mr. Beard expected to receive the full revenue credit for his sale of $12,000,000. However, again, after the deal was closed IBM inexplicably refused to credit him for the full amount. This time, they again arbitrarily chose to only allocate $2,000,000 worth of revenue credit to him without even performing any type of review or notifying Mr. Beard. This was done for the sole purpose of lowering the commissions IBM had to pay Mr. Beard.

36.     After this second cap on his commissions payment, Mr. Beard was paid a total of $410,572 out of the $2,901,806 that he is owed, leaving a balance due of $2,491,234 on both the September HCL deal and the December HCL deal.

37.     HCL had been a client of Mr. Beard's since early 2015. He spent countless hours building relationships with representatives of HCL, often traveling to Boston and New York City, that were invaluable to getting the two deals closed in 2017.

38.     The only reason Mr. Beard was ever provided by IBM for why he was not paid all of the commissions he had earned, was that IBM thought it was simply too much money to pay Mr. Beard, and thus, it was unwilling to pay him in full.

39.     This reasoning did not make any sense to Mr. Beard as he had clearly been promised uncapped commissions; and, in fact, Mr. Beard had earned nearly a million dollars worth of uncapped commissions the previous year and been paid everything that he earned.

40.     Indeed, despite closing many large deals throughout his IBM career, Mr. Beard had *never* had his commissions capped before.

41.     During the same sales period, two of Mr. Beard's peers (both white) closed deals substantially similar to Beard's deals but each were paid in excess of $1,000,000 in sales commissions.  This glaring discrimination was called out to IBM's attention by one of Mr. Beard's managers, Scott Kingston. Not only did IBM ignore it and refuse to reverse the cap on Mr.

9

PLAINTFF'S COMPLAINT

Beard's commissions, IBM doubled down by firing Mr. King in retaliation and refusing to pay him his own commissions!

### IBM Has Admitted It Has An Obligation Not to Cap Commissions

42.     The sales field in which Mr. Beard worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its salespeople that commissions could be capped, it would be severely hampered in its efforts to recruit good salespeople. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high-achievers after the fact.

43.     There is another case that was recently resolved in the Middle District of North Carolina that is very similar to this one, Bobby Choplin v. International Business Machines Corporation, No. 16-cv-1412-TDS-JEP ("the Choplin Action"). Upon information and belief, the plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Mr. Beard's IPL. Like Mr. Beard, the plaintiff was provided a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Beard. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Beard, and what IBM actually paid him and why.

44.     In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit A**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit B**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit C**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the

10

PLAINTFF'S COMPLAINT

highest-level sales managers in the corporation) (**Exhibit D**).  Together, Exhibits A, B, C, and D are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Mr. Beard here.

45.     The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for salespeople like Mr. Choplin and Mr. Beard; (2) salespeople like Mr. Beard were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Beard, was "capping."  For example:

a.   IBM testified as follows:

Q.  The fourth bullet point, you could read that, please.

A. "Earnings opportunity remains uncapped."

Q.  Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?

A. Correct.

Q.  Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?

A. Correct.

Q. So would you agree that IBM had an obligation not to cap Bobby Choplin's earnings opportunity?

A. Yes.

Q.  Would you agree that IBM had an obligation not to cap Bobby Choplin's payments?

A. Correct.

11

PLAINTFF'S COMPLAINT

(Exhibit A, pp. 18-19.)  When asked specifically about whether a salesperson could reasonably rely on the statements in the PowerPoints, IBM testified:

> Q.  And it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 [PowerPoints] regarding their compensation plan?
>
> A. Yes.

(Exhibit A, pp. 67-68.)

   b.  Mr. Batthany testified as follows about the statements in the PowerPoint that commission would be not be capped:

> Q.  Okay. It would be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015, wouldn't it?
>
> A. Yes.

(Exhibit B, p. 79.) Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit D, p. 48.)

   c.  Ms. Maleki testified as follows about what exactly constitutes capping:

> Q. What does that mean to you?
>
> A. Capped?
>
> Q. Right.
>
> A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.
>
> Q. Something different than what your commission formula would produce?
>
> A. Correct.

(Exhibit C, p. 25.)

   d.  Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

12

PLAINTFF'S COMPLAINT

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.

…

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

(Exhibit D, pp. 43, 46-47.)

46.     The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments. Upon information and belief, when referring to its reduction of Mr. Beard's commission payments, also referred to what it was doing as "capping," "capped," "cap," or the like, including in emails sent during the period when IBM reduced Mr. Beard's commission.

47.     Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit E**).

48.     Mr. Beard has met all conditions precedent to the bringing of this action.

13

**FIRST CLAIM FOR RELIEF**
**(Violation of California Labor Code)**

49.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

50.    Plaintiff earned commission wages within the meaning of California Labor Code Sections 200 and 204.1.

51.    IBM has knowingly, intentionally, and willfully failed and refused to pay to Plaintiff the full and complete amount of commissions he earned. IBM has operated under and continues to operate under a common policy and plan of failing and refusing to pay full earned commissions through the operation of its re-plan practices.

52.    Every half year, IBM provides Plaintiff a compilation of written materials that specify the way Mr. Beard's commissions will be computed and paid for that half year. Mr. Beard acknowledges receipt of each time. These compensation plans provide, among other things, that IBM will pay Mr. Beard commissions based on sales credited to Mr. Beard in accordance with the commissions set forth in his compensation plan and that the sales commissions are uncapped.

53.    Mr. Beard has performed all of the duties and obligations required of him by IBM that would entitle him to receive commissions. He has met all lawful conditions precedent to the earning of commissions. IBM has credited Plaintiff for sales that are encompassed by his compensation plan.

54.    IBM relies on provisions in the compensation plan that purport to allow IBM to retroactively change commission terms at any time. These provisions are void and unenforceable exculpatory clauses under California Civil Code Section 1668.

55.    Furthermore, these provisions that purport to allow IBM to retroactively change commissions terms at any time are unlawful, void, and unenforceable under California Labor Code Sections 221, 223, and 2751.

14

PLAINTFF'S COMPLAINT

56.     Labor Code Section 221 states: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." California's Industrial Welfare Commission Wage Orders prohibit employers from using earned wages to offset ordinary business costs.

57.     Labor Code Section 223 states: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

58.     IBM secretly underpays commission wages while purporting to follow the commission rates designated by contract in violation of Section 223. In fact, from 2013 to 2015, IBM secretly underpaid its sales representatives over $40,000,000 nationwide, which includes sales representatives residing in California.

59.     Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid."

60.     IBM relied on methods for the computation and payment of commissions that are not set forth in the commissions contract in violation of Section 2751. In particular, IBM arbitrarily capped Mr. Beard's commissions, despite written promises as part of his compensation plan that his commissions were uncapped.

61.     Individually and collectively, Labor Code Sections 221, 223, and 2751 and Civil Code Section 1668 invalidate IBM's illegal compensation plan provisions and give rise to Plaintiff's claim for unpaid wages under the valid and enforceable terms of their written commissions contracts.

PLAINTFF'S COMPLAINT

62.    Pursuant to California Labor Code §§ 200 *et seq*., Plaintiff is entitled to recover unpaid commissions, with interest, attorneys' fees, costs, and penalties all in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Unfair Competition Law)**

63.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

64.    Defendant is a "person" as defined under California Business & Professions Code Section 17021.

65.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

66.    IBM's conduct, as described herein, was and is in violation of the UCL. IBM's conduct violates the UCL in at least the following ways:

   a.   by knowingly misrepresenting to Mr. Beard the uncapped nature of his sales commissions;

   b.   by willfully failing to pay all earned commissions wages to Mr. Beard; and

   c.   by violating other California laws, including but not limited to, California Labor Code Sections 200, 201, 202, 204, 221, 223, and 2751 and the applicable Industrial Welfare Commission Wage Orders.

67.    Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

68.    IBM's misrepresentations alleged herein caused Plaintiff to sell as many of IBM's products and services as he could, often at the expense of quality time with his family that he

16

PLAINTFF'S COMPLAINT

would not otherwise have sacrificed had he known that IBM would not pay him the commissions he earned.

69.     Accordingly, Plaintiff has suffered injury in fact including lost money as a result of Defendants' misrepresentations.

70.     IBM should be made to disgorge these ill-gotten gains and to restore to Mr. Beard the wrongfully withheld wages to which he is entitled, as well as interest on these wages.

71.     Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq*.

72.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**(Race Discrimination in Violation of FEHA Cal. Govt. Code § 12940 *et seq.*)**

73.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

74.     Mr. Beard is an African American.

75.     IBM engaged in the conduct set forth above based, in part, on Mr. Beard's race. Specifically, IBM capped Mr. Beard's commissions but did not cap commissions similarly situated white sales employees.

76.     IBM's conduct violates the California Fair Employment & Housing Act and has caused injury to Mr. Beard in that he has received far less in earned compensation than he is due.

17

PLAINTFF'S COMPLAINT

77.     Mr. Beard is entitled to recover damages in the form of unpaid commission amounts as well as damages for emotional distress, mental anguish and humiliation.  He is also entitled to recover reasonable attorneys' fees, intertest and costs pursuant to the California Fair Employment & Housing Act.

78.     Further, the conduct was engaged in by IBM senior managers and condoned and ratified by other senior managers and officers of the company and was done so with malicious and fraudulent intent.  Accordingly, punitive damages are warranted in an amount to be proven at trial.

79.     Mr. Beard has satisfied the requisite administrative requirements necessary in order to pursue this matter in court.

## FOURTH CLAIM FOR RELIEF
### (Equal Pay Violation in Violation of California Labor Code 1197.5)

80.     Mr. Beard is African-American.

81.     Mr. Beard performed equal work on a job requiring equal skill, effort, and responsibility as certain non-African American employees employed by IBM, and performed such job under similar working conditions.

82.     IBM treated Mr. Beard's compensation differently than it treated the compensation of non-African American employees.

83.     IBM did not treat Mr. Beard's compensation differently based (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide factor other than race.

84.     Mr. Beard suffered damages as a result of IBM's violation including the loss of compensation, and is entitled to recover such wages, including interest thereon, and an equal amount of liquidated damages.

85.     Mr. Beard is also entitled attorneys' fees.

PLAINTFF'S COMPLAINT

**FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

86.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

87.     To the extent that there was no written contract and to the extent that there was no oral or implied contract, then Mr. Beard alleges a claim for unjust enrichment.

88.     At the specific request of IBM and for its use and benefit, Mr. Beard has performed work for IBM in the form of making sales of its software and services.

89.     The value of the work performed for IBM by Mr. Beard for which he has not been paid is *at least* $2,491,234, although the exact amount is for the jury.

90.     During and since the performance of the work by Mr. Beard, IBM has failed to pay him and there is due and owing to Mr. Beard from IBM, a principal sum amount of *at least* $2,491,234.

91.     Despite Mr. Beard being owed in excess of another $2,491,234, IBM has failed and refused to pay the same or any part of it.

92.     In the alternative to the claim for breach of contract, and as a result of IBM's refusal to pay Mr. Beard the above-stated sum due and owing to him, IBM has become unjustly enriched in the amount of *at least* $75,000.

**SIXTH CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation)**

93.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

94.     IBM, through its agents, represented to Mr. Beard that his commissions would not be capped, in at least the following instances: (1) the PowerPoint, which, upon information and belief, was sent to Mr. Beard after he accepted his 2017 IPL, and was always available via the

19

intranet; and (2) the statements of IBM executives at sales meetings that commissions would not be capped.

95.     Those representations were false.

96.     Upon information and belief, those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr. Beard in making those misrepresentations. Simply put, IBM knew that Mr. Beard's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped.

97.     Indeed, both of Mr. Beard's managers understood what IBM did to him to constitute a cap on his earnings.

98.     Mr. Beard reasonably and justifiably relied on the representations of IBM. Notably, some or all of the representations were made after Mr. Beard signed the IPL, including those in the PowerPoint, and those by IBM executives in sales meetings. Mr. Beard reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Mr. Beard known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Beard known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

99.     Mr. Beard was damaged by IBM's fraudulent statements in an amount exceeding $75,000.

100.     Further, the fraudulent conduct was engaged in by IBM senior managers and condoned and ratified by other senior managers and officers of the company and was done so with

20

PLAINTFF'S COMPLAINT

malicious and fraudulent intent. Accordingly, punitive damages are warranted in an amount to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**
**(Alternative Claim - Negligent Misrepresentation)**

101.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

102.    Mr. Beard alleges this claim in the alternative to the claim for fraudulent misrepresentation.

103.    IBM, through its agents, represented to Mr. Beard that his commissions would not be capped, in at least the following instances: (1) the PowerPoint, which, upon information and belief, was sent to Mr. Beard after he accepted his 2017 IPL, and was always available via the intranet; and (2) the statements of IBM executives at sales meetings that commissions would not be capped.

104.    IBM's agents made the representation negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Mr. Beard rely on the statements, and he reasonably and justifiably relied on the representations of IBM.

105.    Notably, some or all of the representations were made after Mr. Beard signed the IPL, including those in the PowerPoint, and those by IBM executives in sales meetings. Mr. Beard reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM.

106.    Had Mr. Beard known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth

21

and/or did not cap commissions. Had Mr. Beard known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

107.    Indeed, both of Mr. Beard's managers understood what IBM did to him to constitute a cap on his earnings.

108.    IBM owed Mr. Beard a duty of care in making the representations.

109.    Mr. Beard reasonably and justifiably relied on the representations of IBM.

110.    Mr. Beard was damaged by IBM's negligent misrepresentations.

111.    Mr. Beard has been damaged by IBM's negligence in an amount exceeding $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Beard prays the Court for the following relief:

1.    That Mr. Beard have and recover from IBM for violations of the California Labor Code in the amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

2.    That Mr. Beard have and recover from IBM for violations of the California Unfair Competition Law injunctive relief authorized by Business and Professions Code Sections 17202 and 17203 and restitution of his improperly withheld commissions, including interest, costs, and attorneys' fees as allowed by law;

3.    That Mr. Beard have and recover from IBM for violations of the California Fair Employment and Housing Act in the amount exceeding $75,000, plus interest, costs, and attorneys' fees as allowed by law;

4.    That Mr. Beard be awarded liquidated damages pursuant to the California Labor Code;

PLAINTFF'S COMPLAINT

5.     That Mr. Beard have and recover from IBM for unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

6.     That Mr. Beard have and recover from IBM for fraudulent misrepresentation in the amount exceeding $75,000, and interest and costs as allowed by law;

7.     That Mr. Beard have and recover from IBM for negligent misrepresentation in the amount exceeding $75,000, and interest and costs as allowed by law;

8.     That Mr. Beard be awarded punitive damages;

9.     That all costs of this action be taxed against IBM; and

10.    That the Court award Mr. Beard such other and further relief as this Court may deem just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

This the 8th day of November, 2018.

By:     /s/ Seth A Rafkin_____
SETH A. RAFKIN (199166)
(srafkin@rafkinesq.com)
JENNIFER M. BOGUE (259431)
(jbogue@rafkinesq.com)
**RAFKIN ESQ., PLLC**
1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ  07869
Telephone:     (973) 891-3370
Facsimile:     (973) 920-9727

Matthew E. Lee*
N.C. State Bar No. 35405
Jeremy R. Williams*
N.C. State Bar No. 48162
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:     919-600-5000
Facsimile:     919-600-5035

23

PLAINTFF'S COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

matt@wbmllp.com
jeremy@wbmllp.com

*Attorneys for Plaintiff*

\* to be admitted *pro hac vice*

24

PLAINTFF'S COMPLAINT