1  Mitchell F. Boomer (State Bar No. 121441)
   Donald P. Sullivan (State Bar No. 191080)
2  Justin R. Barnes (*pro hac vice*)
   Kelli N. Church (*pro hac vice*)
3  JACKSON LEWIS P.C.
   50 California Street, 9th Floor
4  San Francisco, California 94111-4615
   Telephone: (415) 394-9400
5  Facsimile: (415) 394-9401
   E-mail: Mitchell.Boomer@jacksonlewis.com
6          Donald.Sullivan@jacksonlewis.com
           Justin.Barnes@jacksonlewis.com
7          Kelli.Church@jacksonlewis.com

8  Attorneys for Defendant
   INTERNATIONAL BUSINESS MACHINES
9  CORPORATION

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

13

14 | JEROME BEARD,                          | Case No. 3:18-cv-06783-WHA
   |
15 |              Plaintiff,                | **DEFENDANT INTERNATIONAL
   |                                        | BUSINESS MACHINES CORPORATION'S
16 |         v.                             | NOTICE OF MOTION AND MOTION FOR
   |                                        | SUMMARY JUDGMENT AND
17 | INTERNATIONAL BUSINESS MACHINES        | MEMORANDUM OF POINTS AND
   | CORPORATION,                           | AUTHORITIES**
18 |                                        |
   |              Defendant.                | Date:        April 3, 2020
19 |                                        | Time:        8:00 a.m.
   |                                        | Ctrm.:       12, 19th Fl.
20 |                                        | Judge:       Hon. William Alsup
   |                                        |
21 |                                        | Complaint Filed:    November 8, 2018
   |                                        | Trial Date:         June 1, 2020

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF ISSUES ..................................................................................1

III.  UNDISPUTED MATERIAL FACTS .................................................................2

    A.    Plaintiff's Employment with IBM ..........................................................2

    B.    Plaintiff's Incentive Plan Letter .............................................................2

    C.    The Disclaimers Contained in Plaintiff's IPLs ......................................3

    D.    Alleged Representations Made by IBM ..................................................4

    E.    The Third Quarter Deal with HCL .........................................................5

    F.    The Fourth Quarter Deal with HCL ........................................................9

    G.    Plaintiff Alleges Race Discrimination ...................................................9

IV.   ARGUMENT AND CITATION TO AUTHORITY .........................................11

    A.    Legal Standard ......................................................................................11

    B.    Plaintiff's Fair Employment and Housing Act Claim Fails ..................12

    C.    Plaintiff's Equal Pay Claim Fails .........................................................15

    D.    Plaintiff's Fraud Claim Fails ................................................................17

          i.    Plaintiff cannot show that IBM made false statements. ..............17

          ii.   Plaintiff cannot show he reasonably relied on any alleged false statements. ...................................................................................18

    E.    Plaintiff's Negligent Misrepresentation Claim Fails ............................20

    F.    Plaintiff's Unjust Enrichment Claim Fails ...........................................20

    G.    Plaintiff's Unfair Competition Claim Fails ..........................................21

          i.    Unfair and Fraudulent Prongs. ...................................................21

          ii.   Unlawful Prong. ..........................................................................22

V.    CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**California Cases**

*Animal Legal Defense Fund v. LT Napa Partners LLC,*
    234 Cal.App.4th 1270 (2015)...........................................................................................25

*Caldwell v. Paramount Unified School District,*
    41 Cal.App.4th 189 (1995)..............................................................................................14

*Guz v. Bechtel Nat'l, Inc.,*
    24 Cal.4th 317 (2000) .....................................................................................................12

*Hall v. County of Los Angeles,*
    148 Cal. App. 4th 318 (2007)..........................................................................................17

*Hall v. Time Inc.,*
    158 Cal.App.4th 847 (2008).............................................................................................25

*Lazar v. Hertz Corp.,*
    69 Cal. App. 4th 1494 (1999)..........................................................................................22

*Mixon v. Fair Employment and Housing Commission,*
    192 Cal.App.3d 1306 (1987)...........................................................................................12

*Prachasaisoradej v. Ralphs Grocery Co.,*
    42 Cal. 4th 217, 228 (2007) ............................................................................................23

*Troyk v. Farmers Group, Inc.,*
    171 Cal.App.4th 1305 (2009)..........................................................................................25

**Federal Cases**

*Alvarado v. FedEx Corp.,*
    No. C 04-00098 SI, 2005 U.S. Dist. LEXIS 44186 (N.D. Cal. Aug. 23, 2005) ......................13

*Anderson v. City & Cnty. of San Francisco,*
    169 F. Supp. 3d 995 (N.D. Cal. 2016) ...........................................................................12

*Bosnak v. City & Cnty. of San Francisco,*
    Case No. 14-1429 MEJ, 2017 U.S. Dist. LEXIS 170884 (N.D. Cal. Oct. 16,
    2017) ..................................................................................................................................12

*Campbell v. Brennan,*
    Case No. 15-cv-03582-JSC, 2018 U.S. Dist. LEXIS 14944 (N.D. Cal. Jan. 30,
    2018) ..................................................................................................................................13

*Chew v. City & Cnty. of San Francisco*,
    Case No. 13-cv-05286-MEJ, 2016 U.S. Dist. LEXIS 19987 (N.D. Cal. Feb. 17,
    2016) ................................................................................................................................15

*Chuang v. University of California Davis*,
    225 F.3d 1115 (9th Cir. 2000) ........................................................................................15

*Day v. Sears Holdings Corp.*,
    930 F. Supp. 2d 1146 (C.D. Cal. 2013) ..........................................................................15

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) .....................................................................................11, 24

*Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc.*
    No. C 06-02584 CRB, 2008 U.S. Dist. LEXIS 1658 (N.D. Cal. Jan. 9, 2008) ............17

*Glen K. Jackson, Inc. v. Roe*
    273 F.3d 1192 (9th Cir. 2001) ........................................................................................20

*Integrated Storage Consulting Servs. v. NetApp, Inc.*,
    No. 5:12-CV-06209, 2013 U.S. Dist. LEXIS 107705 (N.D. Cal. July 31, 2013)............21

*Kemp v. IBM*,
    No. 3:09-cv-03683, 2010 U.S. Dist. LEXIS 118801 (N.D. Cal. Nov. 4, 2010) .............23

*Kenney v. Deloitte, Haskins & Sells*,
    No. C 91-0590 BAC, 1992 U.S. Dist. LEXIS 14600 (N.D. Cal. Sept. 1, 1992) .............18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................................................................12

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ........................................................................................11

*O'Connor v. Uber Techs., Inc.*,
    No. C-13-3826 EMC, 2013 U.S. Dist. LEXIS 171813 (N.D. Cal. Dec. 5, 2013) ..........20

*Radue v. Kimberly-Clark Corp.*,
    219 F.3d 612 (7th Cir. 2000) ..........................................................................................13

*Schwarzkopf v. IBM*,
    No. C 08-2715, 2010 U.S. Dist. LEXIS 46813 (N.D. Cal. May 12, 2010) ...............17, 25

*Smith v. UPS*,
    No. C 03-04646 CRB, 2006 U.S. Dist. LEXIS 25104 (N.D. Cal. Mar. 22,
    2006) ................................................................................................................................12

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007)...........................................................................................11

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    Case No.: 3:18-cv-06783-WHA

*Stearns v. Select Comfort Retail Corp.*,
    No. 08-2746 JF, 2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009) ..............................20

*Texas Dept. of Community Affairs v. Burdine*,
    450 U.S. 248 (1981)................................................................................................15

*Thrifty Oil Co. v. Bank of Am. Nat'l . Trust & Sav. Ass'n*,
    322 F.3d 1039 (9th Cir. 2003)................................................................................11

**California Statutes**

California Business & Professions Code
    § 17200....................................................................................................21, 22, 25

California Labor Code................................................................................... passim

California Labor Code
    § 200.................................................................................................................22
    § 201.................................................................................................................22
    § 202.................................................................................................................22
    § 204.................................................................................................................22
    § 221.................................................................................................................23
    § 223.............................................................................................................23, 24
    § 1197.5............................................................................................................16
    § 2751...............................................................................................................22

**Other Authorities**

Federal Rules of Civil Procedure, Rule 56 (a) ............................................................11

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    Case No.: 3:18-cv-06783-WHA

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE WILLIAM H. ALSUP, DISTRICT JUDGE OF THE U.S. DISTRICT COURT, NORTHERN DISTRICT, PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 3, 2020, at 8:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 12 of the above-entitled court, located at the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, before the Honorable William H. Alsup, Defendant INTERNATIONAL BUSINESS MACHINES CORPORATION ("IBM" or "Defendant"), will move the Court for an order granting summary judgment against Plaintiff JEROME BEARD ("Plaintiff") as to Plaintiff's Complaint in its entirety.

This motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, and is based on the grounds that no genuine fact issues exist and that Defendant is entitled to prevail on the claims set forth in Plaintiff's Complaint as a matter of law. This motion is based on this Notice of Motion and Motion for Summary Judgment and Memorandum of Points and Authorities and concurrently filed supporting declaration of Justin R. Barnes, along with supporting evidence attached thereto, the pleadings on file with this Court, including the Complaint, oral argument of counsel, and any other matter which this Court may properly consider.

Dated: February 27, 2020                          JACKSON LEWIS P.C.


                                        By:    /s/ *Justin R. Barnes*
                                               Mitchell F. Boomer
                                               Donald P. Sullivan
                                               Justin R. Barnes (*pro hac vice*)
                                               Kelli N. Church (*pro hac vice*)
                                               Attorneys for Defendant
                                               INTERNATIONAL BUSINESS
                                               MACHINES CORPORATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On November 8, 2018, Plaintiff – a software salesman for IBM – sued IBM alleging that IBM owes him purportedly unpaid commissions related to two deals IBM entered into with HCL America, Inc. ("HCL") in 2017.  Plaintiff initially asserted claims for (1) violation of California Labor Code; (2) violation of California Unfair Competition Law; (3) race discrimination; (4) equal pay violation; (5) unjust enrichment; (6) fraudulent misrepresentation and; (7) negligent misrepresentation. On January 14, 2019, IBM moved to partially dismiss Plaintiff's Complaint. *See* ECF 30. On April 7, 2019, the Court granted in part and denied in part IBM's Partial Motion to Dismiss Plaintiff's Complaint. *See* ECF No. 51. The following claims remain: (1) violation of California Unfair Competition Law; (2) race discrimination; (3) equal pay violation; (4) unjust enrichment; (5) fraudulent misrepresentation and; (6) negligent misrepresentation. Now that the parties have completed discovery, the undisputed facts in the record demonstrate that the claims in Plaintiff's Complaint fail as a matter of law.

## II.   STATEMENT OF ISSUES

1.   Whether Plaintiff's race discrimination claim fails because he cannot show that similarly situated individuals outside his protected class were treated more favorably or that IBM's legitimate, non-discriminatory reasons for adjusting his commissions are a pretext for discrimination.

2.   Whether Plaintiff's equal pay claim fails because he cannot demonstrate that he was paid less for substantially similar work or that the adjustment to his commissions was not based on a bona fide factor other than race.

3.   Whether Plaintiff's fraudulent misrepresentation claim fails because he cannot show that IBM made false statements or that he justifiably relied on any alleged false statements.

4.   Whether Plaintiff's negligent misrepresentation claim fails because he cannot show a misrepresentation or that he justifiably relied on any alleged misrepresentation.

5.   Whether Plaintiff's unjust enrichment claim fails because Plaintiff cannot show that IBM was unjustly enriched.

6.      Whether Plaintiff's Unfair Competition Claim fails because he cannot show an underlying unlawful, unfair, or fraudulent act.

## III.   UNDISPUTED MATERIAL FACTS

### A.    Plaintiff's Employment with IBM

Plaintiff began his employment with IBM in 1983 as a sales trainee. Barnes Decl., Ex A (Pl. Dep. 15:5-15, 15:24-16:3). Plaintiff left IBM in 2000 for two years and became re-employed by IBM in 2002. *Id.*, Ex, A (Pl. Dep. 21:20-22:2, 23:13-17). Since 2008, Plaintiff has sold IBM software or infrastructure to customers who then embed the software into their own products. *Id.*, Ex. A (Pl. Dep. 26:8-10, 27:23-29:15). IBM uses a contract structure known as an Embedded Solution Agreement or ESA to accomplish the sale to an IBM customer. *Id.*, Ex. A (Pl. Dep. 28:4-29:15). The IBM products included in an ESA transaction can vary, meaning, the products the IBM customer is embedding into their own products can vary from deal to deal. *Id.*, Ex. B (Mulada Dep. 174:13-23). Greg Mount was Plaintiff's first line manager in 2017. *Id.*, Ex. A (Pl. Dep. 32:15-19). Scott Kingston was Plaintiff's second line manager in 2017. *Id.*, Ex. A (Pl. Dep. 32:20-33:4). In his current role, Plaintiff is paid a salary plus commissions. *Id.*, Ex. A (Pl. Dep. 31:11-19). In 2017, IBM paid Plaintiff a base salary of $154,000 and commissions in the amount of approximately $398,000. *Id.*, Ex. A (Pl. Dep. 35:16-36:1). In 2018, IBM paid Plaintiff a base salary of $155,000 and commissions in the amount of approximately $703,000. *Id.*, Ex. A (Pl. Dep. 36:2-10). Plaintiff still works for IBM on ESA deals. *Id.*, Ex. A (Pl. Dep. 11:11-21, 26:8-10).

### B.    Plaintiff's Incentive Plan Letter

Throughout his employment with IBM, Plaintiff received Incentive Plan Letters ("IPL"), each covering a six-month sales period. *Id.*, Ex. A (Pl. Dep. 71:17-21). Plaintiff read his IPL each time he received a new one. *Id.*, Ex. A (Pl. Dep. 68:25-69:15). The IPL set Plaintiff's quota for each sales period. *Id.*, Ex. A (Pl. Dep. Ex. 6). Plaintiff accepted his IPL for the second half of 2017 on July 7, 2017, which covered the selling period beginning July 1, 2017 through December 31, 2017. *Id.*, Ex. A (Pl. Dep. 41:20-42:2, Ex. 6). Plaintiff's sales quota for software sales for the second half of 2017 was $934,736. *Id.*, Ex. A (Pl. Dep. 42:3-5).

## C. The Disclaimers Contained in Plaintiff's IPLs

Without an IPL in place, Plaintiff was not eligible to receive incentive payments. *Id.*, Ex. A (Pl. Dep. 99:24-100:5). Additionally, Plaintiff's IPL for the second half of 2017 stated "[b]y accepting this Incentive Plan Letter you acknowledge that you have read and understood the terms of the Plan." *Id.*, Ex. A (Pl. Dep. Ex. 6). Plaintiff views his IPL as an agreement between him and IBM. *Id.*, Ex. A (Pl. Dep. 73:13-15).

Plaintiff's IPL for the second half of 2017 contained an "Other Important Information" section, which Plaintiff admits he read when he received his IPL. *Id.*, Ex. A (Pl. Dep. 68:25-69:15). Several of the disclaimers in the "Other Important Information" section are of particular relevance here. Plaintiff's IPL for the second half of 2017 contained the following "Right to Modify or Cancel" clause:

> **Right to Modify or Cancel:** The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing your accepted Incentive Plan Letter if your incentive eligibility status changes.

*Id.*, Ex. A (Pl. Dep. Ex. 6). Plaintiff's IPL for the second half of 2017 also contained a "Review of a Specific Transaction" clause, which provided:

> **Review of a Specific Transaction:** If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

*Id.*, Ex. A (Pl. Dep. 71:25-72:13, Ex. 6). Plaintiff admits that the "Review of a Specific Transaction" clause permits IBM to review, and in its sole discretion, adjust the incentive achievement and/or related payments on a specific transaction. *Id.*, Ex. A (Pl. Dep. 87:1-6). Plaintiff also admits that, if IBM decides to adjust incentive payments on a deal pursuant to the "Review of a Specific Transaction" clause, it does not affect a sales representative's ability to earn commissions on other deals. *Id.*, Ex. A (Pl. Dep. 87:21-88:2). Prior to the dispute giving rise to this lawsuit, no one ever told Plaintiff that the Specific Transaction clause did not apply to him. *Id.*, Ex. A (Pl. Dep. 72:25-

3

73:5).

Plaintiff's IPL for the second half of 2017 included an "Adjustment for Errors" clause, which stated:

> **Adjustment for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

*Id.*, Ex. A (Pl. Dep. Ex. 6).

Plaintiff's IPL for the second half of 2017 also set forth when incentive payments were earned in a "Full-Plan Earnings" clause, which stated:

> **Earnings:** Incentive payments you may receive for Plan-to-Date achievement are a form of advance payment based on incomplete business results. Your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period. (Or, if applicable, after the date you left the Incentive Plan early.) Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; and (3) the customer has paid the billing for the sales or services transaction related to your incentive achievement.

*Id.*, Ex. A (Pl. Dep. Ex. 6).

No one ever told Plaintiff not to read the disclaimers in the "Other Important Information" section. *Id.*, Ex. A (Pl. Dep. 73:6-12). No one ever hid the disclaimers in the "Other Important Information" section from Plaintiff. *Id.*, Ex. A (Pl. Dep. 73:6-9).

### D. Alleged Representations Made by IBM

Plaintiff's IPL for the second half of 2017 contained a link to IBM's Incentives Workplace. *Id.*, Ex. A (Pl. Dep. 69:16-70:8, Ex. 6). The Incentives Workplace contained educational information related to sales plans, including the PowerPoint titled "Your 2017 Incentive Plan, Individual Quota Plan (IQP) – Employees" at issue in this lawsuit. *Id.*, Ex. A (Pl. Dep. 80:4-11, Ex. 5). The IPL defined the "Plan" to include not only the IPL but also the educational information contained on the Incentives Workplace. *Id.*, Ex. A (Pl Dep. 70:14-18, Ex. 6). The PowerPoint

presentation states that "payments uncapped." *Id.*, Ex. A (Pl. Dep. 84:6-8). Prior to the dispute giving rise to this lawsuit, Plaintiff admits he never talked to anyone about the "uncapped" language. *Id.*, Ex. A (Pl. Dep. 94:6-12). Plaintiff defines uncapped to mean that there is no artificial limit to what a sales representative can make. *Id.*, Ex. A (Pl. Dep. 84:16-85:2).

While the PowerPoint explains that IBM does not cap sales representatives' overall commissions or earnings, Plaintiff admits that his IPL provided that IBM does have the right to adjust his commissions on specific transactions pursuant to the "Review of a Specific Transaction" clause. *Id.*, Ex. A (Pl. Dep. 86:10-87:20, Ex. 6); Ex. C (Lipner Dep. 98:24-99:6). Specifically, when a transaction has a disproportionate effect on an incentive payment relative to a sales representatives' quota or contribution towards that transaction, IBM can review the transaction and adjust the incentive achievement and related payment. *Id.*, Ex. D (Johnson Dep. 95:1-10, 101:7-25, 102:6-103:7); Ex. C (Lipner Dep. 193:3-8). While a sales representatives' contribution is not normally taken into consideration when determining an incentive payment, if a transaction is unique, the "Review of a Specific Transaction" clause allows for a review of contribution on the transaction and the incentive payment may be adjusted accordingly. *Id.*, Ex. C (Lipner Dep. 60:6-14); Ex. D (Johnson Dep. 94:1-95:10, 101:7-25). Plaintiff agrees that when IBM reviews and adjusts commissions on a single deal pursuant to that provision, that does not impact a sales representative's ability to earn commissions on other deals. *Id.*, Ex. A (Pl. Dep. 87:21-88:2).

### E.     The Third Quarter Deal with HCL

Plaintiff participated in a deal between IBM and HCL that closed in the third quarter of 2017. *Id.*, Ex. A (Pl. Dep. 47:3-15). In the summer of 2017, IBM began seeking buyers to purchase IBM's intellectual property; IBM sent notice to potential buyers. *Id.*, Ex. E (Suh Dep. 62:23-63:6). The deal would be an IPP deal or an IP Partnership whereby a buyer would buy certain IBM intellectual property and continue to develop it. *Id.*, Ex. B (Mulada Dep. 93:7-94:6, 94:18-95:4). In 2017, Inhi Suh was General Manager of Watson Working and Collaboration. *Id.*, Ex. E (Suh Dep. 40:15-19). The products that would be included in the IPP deal were products in Ms. Suh's portfolio. *Id.*, Ex. E (Suh Dep. 40:15-41:4).

HCL was one potential buyer who received notice of the possible deal. *Id.*, Ex. E (Suh.

Dep. 63:4-6, 63:24-64:7). However, a different company, Aricent, was initially the primary bidder. *Id.*, Ex. E (Suh Dep. 66:6-10). Eventually, on September 21, 2017, Ms. Suh met with a representative from HCL to discuss the potential deal. *Id.*, Ex. E (Suh Dep. 65:23-68:12). During this meeting, Ms. Suh suggested the possibility of also including an ESA component to the deal, something that was not on the table with Aricent. *Id.* The next day HCL and IBM agreed to the IPP deal with an ESA component. *Id.*, Ex. E (Suh Dep. 65:23-68:12); Ex. B (Mulada Dep. 106:3-5). Brian Mulada, VP, CFO, and COO for the Cognitive Solutions Group was also involved in negotiating the third quarter deal with HCL, including the decision to use the ESA piece. *Id.*, Ex. B (Mulada Dep. 99:13-100:2); Ex. A (Pl. Dep. 54:1-17). The products in the third quarter deal were in Mr. Mulada's portfolio of products, hence his involvement. *Id.*, Ex. B (Mulada Dep. 174:13-23).

In the third quarter deal with HCL, HCL would own development for certain products going forward and IBM would pay HCL a revenue share for those products. *Id.*, Ex. B (Mulada Dep. 93:7-94:6, 94:18-95:4). Additionally, under the ESA component, HCL would buy select software that they would then embed into their products and sell. *Id.*, Ex. B (Mulada Dep. 96:6-97:10). HCL would pay IBM approximately $80,000,000 for the IPP piece of the deal and approximately $20,000,000 for the ESA piece of the deal. *Id.*, Ex. B (Mulada Dep. 166:18-167:4).

Plaintiff did not create the third quarter deal but was brought in to structure the ESA. *Id.*, Ex. E (Suh Dep. 61:22-62:11); Ex. B (Mulada Dep. 99:13-100:2). The third quarter deal was confidential, so it was under a non-disclosure agreement or NDA. *Id.*, Ex. B (Mulada Dep. 120:23-121:9). The third quarter deal with HCL closed on September 30, 2017. *Id.*, Ex. B (Mulada Dep. 92:17-21). Prior to the deal closing, Plaintiff's first line manager, Greg Mount told Plaintiff that his commissions on the third quarter deal would get reviewed by management. *Id.*, Ex. A (Pl. Dep. 112:2-113:25).

After the third quarter HCL deal closed, on October 7, 2017, Mr. Mulada reached out to Maria Lipner, Vice President of Global Sales Incentives. *Id.*, Ex. B (Mulada Dep. 128:8-129:13); Ex. C (Lipner Dep. 34:15-20). Mr. Mulada wanted to ensure that the commissions on the HCL deal were appropriate and reasonable. *Id.*, Ex. B (Mulada Dep. 128:8-129:13, 131:15-132:3). He stated to Ms. Lipner, "[c]an you please confirm that the HCL ESA is either carved out or not impacting

our seller commissions? This deal was closed directly by Inhi/Sean Flynn/Jerome Beard. I can call you and give you all the details/background. It was a large deal done at top and I want to make sure not flowing [business as usual]." *Id.*, Ex. C (Lipner Dep. 139:18-140:14). Ms. Lipner responded the same day and informed Mr. Mulada that she would look into it and asked for more details; she also informed him that normally contribution is not part of the process when determining incentive payments, but that they would obtain the facts and provide him options. *Id.*, Ex. C (Lipner Dep. 140:22-141:15). Mr. Mulada then responded the next day providing more details on the deal and explaining it was an outlier. *Id.*, Ex. C (Lipner Dep. 147:11-21).

In the meantime, Plaintiff's commissions on the HCL deal were undergoing a standard process for review of out-of-range achievement percentages. *Id.*, Ex. D (Johnson Dep. 128:24-129:8). Plaintiff's achievement triggered an out-of-range review. *Id.*, Ex. D (Johnson Dep. 137:5-9). In an out-of-range review the incentives team seeks input from the sales representatives' line management. *Id.*, Ex. D (Johnson Dep. 59:7-22). On October 18, 2017, Plaintiff's first line manager, Greg Mount was asked to review Plaintiff's achievement relative to the third quarter deal. *Id.*, Ex. F (Mount Dep. 63:1-16). Mr. Mount confirmed the achievement was in line with his expectations. *Id.*, Ex. F (Mount Dep. 64:5-65:9). On October 19, 2017, Plaintiff's second line manager, Scott Kingston, also confirmed it was correct. *Id.*, Ex. F (Mount Dep. 67:6-13). Next, Plaintiff's third line manager, Dave Mitchell, confirmed Plaintiff's achievement was accurate. *Id.*, Ex. G (Mitchell Dep. 220:1-221:3). The incentives team informed Mr. Mitchell that if he approved the amount, it would be reviewed further by Karla Johnson. *Id.* Ms. Johnson is the Director of North American and Latin America Sales Commissions. *Id.*, Ex. D (Johnson Dep. 30:14-31:21). In this role, Ms. Johnson is responsible for reviewing and calculating incentive payments based on the information received from IBM's financial systems. *Id.*

Based on Mr. Mulada's October 7, 2017 email, it was decided to hold the normal commission flow for the HCL deal while the transaction could be reviewed. *Id.*, Ex. D (Johnson Dep. 60:20-61:15, 62:23-63:3). Ms. Johnson informed Plaintiff on October 20, 2017 that the HCL deal was undergoing an additional review process and payment would not be received until the review was complete. *Id.*, Ex. D (Johnson Dep. 178:23-179:7).

On November 8, 2017, Ms. Lipner responded to Mr. Mulada's October 8, 2017 email, copying Ms. Johnson informing Mr. Mulada that they investigated the deal and it should be treated differently because it was unique. *Id.*, Ex. C (Lipner Dep. 156:21-157:19). The decision was made that only individuals who were part of the NDA should receive commissions. *Id.*, Ex B (Mulada Dep. 159:16-22, 160:11-17, 164:22-165:6). This means that individuals who were not on the NDA who would have received commissions through the normal process did not receive any commissions for this transaction. *Id.*, Ex. B (Mulada Dep. 159:16-22, 160:11-17, 164:22-165:6); Ex. A (Pl. Dep. 197:14-22).

With respect to Plaintiff's commissions on the deal, because the HCL deal was reviewed pursuant to the "Review of a Specific Transaction" clause from Plaintiff's IPL, Ms. Johnson informed Mr. Mulada that because Plaintiff's achievement was out-of-range, Mr. Mulada should review Plaintiff's contribution and determine an appropriate achievement amount for Plaintiff. *Id.*, Ex. D (Johnson Dep. 63:25-64:17, 210:7-211:13); Ex. C (Lipner Dep. 105:9-15, 109:11-23).

To determine an appropriate amount, Mr. Mulada discussed Plaintiff's contribution on the HCL deal with Ms. Suh. *Id.*, Ex. B (Mulada Dep. 174:3-12); Ex. E (Suh Dep. 89:10-25, 91:25-92:14, 153:18-25, 154:15-22). Mr. Mulada also considered prior ESA-level activity and the ESA pipeline. *Id.*, Ex. B (Mulada Dep. 171:5-172:17). Mr. Mulada wanted to ensure Plaintiff was paid a reasonable amount for his work on the deal. *Id.* The commissionable revenue flowing from the HCL ESA deal was $12,600,000. *Id.*, Ex. B (Mulada Dep. 186:12-20). After reviewing Plaintiff's contribution, Mr. Mulada made the decision to flow $2,000,000 in commissionable revenue to Plaintiff for the HCL deal rather than $12,600,000. *Id.* This resulted in a reduction of Plaintiff's commission on the third quarter HCL deal from $1,464,417 to $232,457.59. *Id.*, Ex. H (IBM's Second Supplemental Interrogatory Resp., pg. 9); Ex. C (Lipner Dep. 161:18-24). Plaintiff's commissions were adjusted pursuant to the "Review of a Specific Transaction" clause in his IPL. *Id.*, Ex. D (Johnson Dep. 210:7-211:13); Ex. C (Lipner Dep. 105:9-15, 109:11-23). Even after the commissions adjustment on the third quarter HCL deal, Plaintiff was still the highest paid person on the deal. *Id.*, Ex. H (IBM's Second Supplemental Interrogatory Resp., pg. 9).

**F.**     **The Fourth Quarter Deal with HCL**

Plaintiff also participated in a deal between IBM and HCL that closed in the fourth quarter of 2017. *Id.*, Ex. A (Pl. Dep. 57:20-22, 58:9-11). Plaintiff became aware of the fourth quarter deal at the end of September 2017. *Id.*, Ex. A (Pl. Dep. 57:20-24). The fourth quarter HCL deal was an ESA bundled with a purchase commitment, meaning IBM agreed to buy services from HCL and HCL agreed to buy software from IBM. *Id.*, Ex. B (Mulada Dep. 224:4-22). According to Plaintiff, the total value of the fourth quarter deal was approximately $100,000,000 and the ESA piece was worth approximately $15,000,000. *Id.*, Ex. A (Pl. Dep. 61:2-9). Mr. Mulada was also involved in the fourth quarter deal. *Id.*, Ex. A (Pl Dep. 61:20-23). Again, Plaintiff's role in the fourth quarter deal was to structure the ESA piece of the deal. *Id.*, Ex. A (Pl. Dep. 61:10-12). The fourth quarter deal closed in December 2017. *Id.*, Ex. A (Pl. Dep. 58:9-11).

Greg Mount told Plaintiff prior to the fourth quarter deal closing that he was going to be paid commissions on this deal based on a $2,000,000 revenue attainment as had been done on the third quarter deal. *Id.*, Ex. A (Pl. Dep. 156:6-157:7). After learning that he would be paid based on a $2,000,000 revenue attainment, Plaintiff continued to work on and close the fourth quarter deal. The $2,000,000 achievement resulted in a commission payment of $325,441.05. *Id.*, Ex. B (Mulada Dep. 208:21-209:17); Ex. H (IBM's Second Supplemental Interrogatory Resp., pg. 9). As with the first HCL deal, Mr. Mulada made the decision with respect to Plaintiff's attainment on the fourth quarter deal. *Id.*, Ex. B (Mulada Dep. 217:12-19). Even after the commissions adjustment on the fourth quarter HCL deal, Plaintiff was still the highest paid person on the deal. *Id.*, Ex. H (IBM's Second Supplemental Interrogatory Resp., pg. 9).

**G.**     **Plaintiff Alleges Race Discrimination**

In July 2018, Plaintiff initiated an internal complaint at IBM called an Open Door. *Id.*, Ex. A (Pl. Dep. 164:22-165:12). Plaintiff alleged that he was discriminated against because of his race (African American). *Id.*, Ex. I (LaCivita Dep. 50:19-23, 114:23-115:4). IBM assigned Nancy LaCivita to investigate Plaintiff's Open Door. *Id.*, Ex. A (Pl. Dep. 171:22-172:3). As part of her investigation, Ms. LaCivita interviewed Plaintiff, Dave Mitchell, Brian Mulada, Greg Mount, and Karla Johnson. *Id.*, Ex. A (Pl. Dep. 172:7-8); Ex. I (LaCivita Dep. 56:9-17). At the end of the

investigation, Ms. LaCivita concluded that Plaintiff was paid in accordance with IBM's compensation practices and policies and concluded no discrimination occurred. *Id.*, Ex. I (LaCivita Dep. 53:14-16, 55:5-7). More specifically, Ms. LaCivita concluded that the decision related to Plaintiff's commissions on the HCL deals was based on his contribution to those deals. *Id.*, Ex. I (LaCivita Dep. 78:10-13).

Plaintiff believes he was discriminated against because he is aware of two Caucasian ESA sales representatives who did not have their commissions adjusted on ESA deals. *Id.*, Ex. A (Pl. Dep. 137:7-138:15). Those two sales representatives are Nick Donato and Bill Beroza. *Id.*, Ex. A (Pl. Dep. 140:3-23). In the first half of 2017, Nick Donato participated in a deal with IBM customer SAS. *Id.*, Ex. A (Pl. Dep. 179:3-5). The SAS deal was an ESA deal that was not bundled with another larger deal as with the HCL deals. *Id.*, Ex. A (Pl. Dep. 143:20-144:4). Plaintiff does not know how long Mr. Donato worked on the SAS deal, does not know if Brian Mulada was involved in the SAS deal, did not speak with anyone regarding the complexity of the SAS deal or the time pressure of the deal. *Id.*, Ex. A (Pl. Dep. 143:14-15, 144:5-7, 180:11-17, 182:21-23). Mr. Mulada was not involved in any decision related Mr. Donato's commissions on the SAS deal; indeed, Mr. Mulada is not even aware who Mr. Donato is. *Id.*, Ex. B (Mulada Dep. 241:8-12).

Mr. Berzoa participated in a deal with IBM customer Deloitte. *Id.*, Ex. A (Pl. Dep. 179:10-12). The Deloitte deal was an ESA deal that was not bundled with another larger deal as with the HCL deals. *Id.*, Ex. A (Pl. Dep. 143:22-144:4). Plaintiff does not know how long Mr. Beroza worked on the Deloitte deal, does not know if Brian Mulada was involved in the Deloitte deal, did not speak with anyone regarding the complexity of the Deloitte deal or the required post-closing activity. *Id.*, Ex. A (Pl. Dep. 143:17-19, 144:5-7, 180:11-181:5). Mr. Mulada was not involved in any decision related Mr. Beroza's commissions on the Deloitte deal; indeed, Mr. Mulada is not even aware who Mr. Beroza is. *Id.*, Ex. B (Mulada Dep. 241:18-22).

Plaintiff, however, is aware that Mr. Beroza's treatment related to the Deloitte deal is the same as Plaintiff was previously treated related to a deal with Accenture. *Id.*, Ex. A (Pl. Dep. 144:8-145:22). Mr. Beroza worked on the Deloitte deal as an ESA deal and then the contract vehicle was changed to an ELA deal, meaning Mr. Beroza did not get credit for the deal when it closed because

10

it was no longer an ESA deal. *Id.*, Ex. A (144:11-145:5); Ex. G (Mitchell Dep. 120:2-121:23). For Mr. Beroza to receive commissions for the Deloitte deal an exception had to be granted, which was granted, and Mr. Beroza received commissions for his work on the Deloitte deal. *Id.*, Ex. A (Pl. Dep. 144:8-145:22); Ex. G (Mitchell Dep. 124:12-22). The same situation occurred previously to Plaintiff related to a deal with Accenture. *Id.* An exception was granted, and Plaintiff was paid commissions for his work on the Accenture deal. *Id.*

Additionally, Plaintiff is aware that David Swafford, another Caucasian sales representative on the ESA team, like Plaintiff had his commissions reduced. *Id.*, Ex. A (Pl. Dep. 192:13-193:13, 196:18-20).

## IV. ARGUMENT AND CITATION TO AUTHORITY

### A. <u>Legal Standard</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the unmoving party." *Thrifty Oil Co. v. Bank of Am. Nat'l . Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). On any claim that the non-moving party will have the burden of proof at trial, the movant may obtain summary judgment either by producing evidence negating an essential element of the non-moving party's claim or by merely pointing out an absence of evidence supporting the non-moving party's claim. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the movant satisfies this initial burden, then the opposing party must go beyond the pleadings and "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[B]ald assertions or a mere scintilla of evidence in his favor" will not suffice. *Id.* (citation omitted). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 201 F.3d at 1103.

B.      **Plaintiff's Fair Employment and Housing Act Claim Fails**

       i.      **Plaintiff cannot establish a *prima facie* case of race discrimination.**

Plaintiff's claim fails because he is unable to establish a *prima facie* case. California utilizes the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for claims of discrimination in violation of FEHA. *Guz v. Bechtel Nat'l, Inc*., 24 Cal.4th 317, 353 (2000). Plaintiff alleges that IBM discriminated against him based on race. To establish a *prima facie* race discrimination claim, Plaintiff must prove: (1) he belonged to a protected class; (2) he was qualified for the position and was satisfactorily performing his job; (3) he was subjected to an adverse employment action; and (4) others outside his protected class were treated more favorably. *Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1015 (N.D. Cal. 2016); *Mixon v. Fair Employment and Housing Commission*, 192 Cal.App.3d 1306, 1318 (1987).

Plaintiff's claim fails because he is unable to show that others outside his protected class were treated more favorably. Plaintiff alleges that Nick Donato and Bill Beroza are similarly situated individuals outside his protected class who were treated more favorably. Barnes Decl., Ex. A (Pl. Dep. 140:3-23). However, merely asserting that individuals are similarly situated does not make them so. *Anderson*, 169 F. Supp. 3d at 1018. Plaintiff must demonstrate that Mr. Donato and Mr. Beroza dealt with the same supervisor, were subjected to the same standards, and they engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. *Id.*; *Smith v. UPS*, No. C 03-04646 CRB, 2006 U.S. Dist. LEXIS 25104, at *16 (N.D. Cal. Mar. 22, 2006).

It is undisputed that the individual who made the decision with respect to Plaintiff's commissions payments was not involved in the decision regarding Mr. Donato or Mr. Beroza. Barnes Decl., Ex. B (Mulada Dep. 241:8-12, 241:18-22). Plaintiff's claim fails for this reason alone. *Bosnak v. City & Cnty. of San Francisco*, Case No. 14-1429 MEJ, 2017 U.S. Dist. LEXIS 170884, at *37-38 (N.D. Cal. Oct. 16, 2017) (finding that plaintiff was unable to create a triable issue of fact that he was treated differently from similarly situated individuals because the individuals identified were employed in different positions and "different supervisors investigated and considered their

altercation in deciding whether or not to discipline them, reviewed their past disciplinary history, and determined the weight of the allegations against them, as well as their credibility."); *Alvarado v. FedEx Corp.*, No. C 04-00098 SI, 2005 U.S. Dist. LEXIS 44186, at *39 (N.D. Cal. Aug. 23, 2005) (employee was not similarly situated where the hiring manager for the position was not the same). *See also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.").

Moreover, Plaintiff himself admitted the HCL deals were different than the SAS deal and the Deloitte deal in that the HCL ESA deals were both part of a larger deal. Barnes Decl., Ex. A (Pl. Dep. 143:20-144:4). Additionally, Plaintiff testified that he did not speak with anyone regarding the complexity of the deals, the required post-closing activity, the time pressure of the SAS deal, and did not know how long Mr. Donato or Mr. Beroza worked on the deals. *Id.*, Ex. A (Pl. Dep. 143:14-15, 143:17-19, 144:5-7, 180:11-181:5, 182:21-23). Plaintiff is wholly unable to establish that Mr. Donato and Mr. Beroza are similarly situated.

Indeed, Plaintiff even admitted that he and Mr. Beroza were treated *the same* in regards to deals that were switched from ESA to ELA at the last minute. *Id.*, Ex. A (Pl. Dep. 144:8-145:22). Both Plaintiff and Mr. Beroza were granted an exception to receive commissions for their work on deals they would have otherwise not been paid for. *Id.* Thus, all Plaintiff is able to show is that he and Mr. Beroza were in fact treated similarly in a similar situation.

Despite this, Plaintiff just assumed he was discriminated against based on his race because he believes Mr. Donato and Mr. Beroza did not have their commissions adjusted. *Id.*, Ex. A (Pl. Dep. 137:7-138:15). As Plaintiff testified, he always feels like he is being treated differently because he is African American. *Id.*, Ex. A (Pl. Dep. 134:9-15). This, however, is insufficient to establish a claim for race discrimination. *Campbell v. Brennan*, Case No. 15-cv-03582-JSC, 2018 U.S. Dist. LEXIS 14944, at *18 (N.D. Cal. Jan. 30, 2018) (conclusory allegations of discrimination are insufficient to overcome a motion for summary judgment). Thus, IBM should be granted summary judgment on this claim.

### ii.   IBM had a legitimate, non-discriminatory reason for its actions that Plaintiff cannot demonstrate are a pretext for discrimination.

Even if Plaintiff is able to establish a *prima facie* case (which he is not), the burden then shifts to IBM to articulate a legitimate, nondiscriminatory reason for its actions, typically founded upon the needs of the business. *Caldwell v. Paramount Unified School District*, 41 Cal.App.4th 189, 203 (1995). If IBM provides a legitimate business purpose for the adjustment, the final burden rests with Plaintiff to establish that the legitimate business reason explaining the adjustment was pretextual, and the real reason was his status in a protected class. *Id.*

As discussed above, because the HCL deals were unique, Mr. Mulada wanted them reviewed to ensure the commissions were appropriate and reasonable. Barnes Decl., Ex. B (Mulada Dep. 128:8-129:13). Because Plaintiff's achievement for the third quarter HCL deal was out-of-range, Mr. Mulada reviewed Plaintiff's contribution on the deal pursuant to the "Review of a Specific Transaction" clause in Plaintiff's IPL. *Id.*, Ex. D (Johnson Dep. 63:25-64:17, 210:7-211:13); Ex. C (Lipner Dep. 105:9-15, 109:11-23). To determine an appropriate amount, Mr. Mulada discussed Plaintiff's contribution on the HCL deal with Ms. Suh. *Id.*, Ex. B (Mulada Dep. 174:3-12); Ex. E (Suh Dep. 89:10-25, 91:25-92:14, 153:18-25, 154:15-22). Mr. Mulada also considered prior ESA-level activity and the ESA pipeline. *Id.*, Ex. B (Mulada Dep. 171:5-172:17). Mr. Mulada wanted to ensure Plaintiff was paid a reasonable amount for his work on the deal. *Id.* After reviewing Plaintiff's contribution, Mr. Mulada made the decision to flow $2,000,000 in commissionable revenue to Plaintiff for the HCL deal rather than $12,600,000 which was commensurate with Plaintiff's work on the deal. *Id.*, Ex. B (Mulada Dep. 186:12-20).

Additionally, because Plaintiff's work on the fourth quarter deal was similar to his work on the third quarter deal, Mr. Mulada made the decision to treat the fourth quarter deal the same as the third quarter deal, which resulted in an adjustment to Plaintiff's commissions that was commensurate with the work he did on the fourth quarter deal. *Id.*, Ex. B (Mulada Dep. 208:21-209:-17). Even after the adjustments, Plaintiff was the highest paid individual on both deals. *Id.*, Ex. H (IBM's Second Supplemental Interrogatory Resp., pg. 9). The adjustment to Plaintiff's commissions had nothing to do with race, but rather was to ensure that Plaintiff was paid an

appropriate amount commensurate with his contribution. Since IBM has articulated a legitimate, non-discriminatory reason for its actions, the burden shifts to Plaintiff to demonstrate pretext.

To show that IBM's articulated reason for its actions was not the true reason, Plaintiff "may succeed. . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). *See also Chuang v. University of California Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000). Plaintiff cannot simply show that IBM's decision was wrong, mistaken, or unwise. *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1171 (C.D. Cal. 2013). Rather, he must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in IBM's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that IBM did not act for the asserted nondiscriminatory reasons. *Id.*

Merely because Mr. Donato and Mr. Beroza did not have their commissions adjusted is insufficient to show pretext. To the contrary, as Plaintiff testified, he and Mr. Beroza were treated similarly in similar situations. Barnes Decl., Ex. A (Pl. Dep. 144:8-145:22). Further, as Plaintiff admitted, a Caucasian sales representative on the ESA team also had his commissions adjusted. *Id.*, Ex. A (Pl. Dep. 192:13-193:13, 196:18-20). This cuts against Plaintiff's allegation of discrimination. *Day*, 930 F. Supp. 2d at 1167 (in the context of determining pretext, showing that another employee was treated in a similar manner negated a showing of discriminatory intent) (citations omitted). All Plaintiff is left with is his subjective belief that he was discriminated against because of his race. This is insufficient to demonstrate pretext. *Chew v. City & Cnty. of San Francisco*, Case No. 13-cv-05286-MEJ, 2016 U.S. Dist. LEXIS 19987, at *39 (N.D. Cal. Feb. 17, 2016) ("His subjective belief…that the City discriminated against him is unpersuasive and insufficient to defeat the City's Motion. And the fact that Chew personally does not believe the asserted reasons why he was disciplined is not sufficient to transform those reasons into a pretext for discrimination."). Plaintiff has offered no evidence of pretext, and his FEHA claim fails.

### C.    <u>Plaintiff's Equal Pay Claim Fails</u>

Under California's Equal Pay Act, Plaintiff must show that he was paid less than other non-

15

African American employees for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." Cal. Lab. Code § 1197.5(b). If Plaintiff carries this burden, then the employer must show that the wage differential was based upon one or more of the following factors: a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or a bona fide factor other than race. Cal. Lab. Code § 1197.5(b)(1).

Plaintiff cannot demonstrate that he was paid less than Nick Donato and Bill Beroza for "substantially similar work." Indeed, as Plaintiff himself explained, the deals were not similar; rather in Plaintiff's mind, the Deloitte and SAS deals were less complex, required no post-closing activity, did not have the same time pressure, and did not require travel as the HCL deals required. Barnes Decl., Ex. A (Pl. Dep. 180:1-181:2, 181:24-182:20, 183:3-9). Thus, Plaintiff himself believed the work on the various deals was not substantially similar. Thus, his equal pay claim fails for this reason.

Moreover, despite his opinion, Plaintiff testified that he is not aware how long Mr. Donato or Mr. Beroza worked on the deals and he did not speak with anyone regarding the complexity, time pressure of the SAS deal, or the required post-closing activity. *Id.*, Ex. A (Pl. Dep. 143:14-15, 143:17-19, 144:5-7, 180:11-181:5, 182:21-23). Thus, Plaintiff has no evidence to show that he was paid less for substantially similar work.

Even if Plaintiff could prove a *prima facie* claim (which he cannot), any difference in Plaintiff's commissions and Mr. Donato's and Mr. Beroza's commissions was based on a bona fide factor other than race. As discussed above, because the HCL deals were unique, Mr. Mulada wanted them reviewed to ensure the commissions were appropriate and reasonable. Barnes Decl., Ex. B (Mulada Dep. 128:8-129:13). Because Plaintiff's achievement for the third quarter HCL deal was out-of-range, Mr. Mulada reviewed Plaintiff's contribution on the deal pursuant to the "Review of a Specific Transaction" clause in Plaintiff's IPL. *Id.*, Ex. D (Johnson Dep. 63:25-64:17, 210:7-211:13); Ex. C (Lipner Dep. 105:9-15, 109:11-23). To determine an appropriate amount, Mr. Mulada discussed Plaintiff's contribution on the HCL deal with Ms. Suh. *Id.*, Ex. B (Mulada Dep. 174:3-12); Ex. E (Suh Dep. 89:10-25, 91:25-92:14, 153:18-25, 154:15-22). Mr. Mulada also

16

considered prior ESA-level activity and the ESA pipeline. *Id.*, Ex. B (Mulada Dep. 171:5-172:17). Thus, considering Plaintiff's contribution (and not his race) on the HCL deals, Mr. Mulada made the decision to pay Plaintiff over $550,000 in commissions on those deals consistent with the "Review of a Specific Transaction" clause in Plaintiff's IPL. The fact that Mr. Mulada was not even involved in the decisions regarding Mr. Donato's and Mr. Beroza's commissions necessarily means that race could *not* have been a factor.

Additionally, Plaintiff testified that he is aware of a Caucasian ESA sales representative, David Swafford, who also had his commissions adjusted. *Id.*, Ex. A (Pl. Dep. 192:13-193:13, 196:18-20). Thus, Plaintiff is aware that other ESA sales representatives have also had their commissions adjusted pursuant to the same IPL provision as Plaintiff; accordingly, his equal pay claim fails. *Hall v. County of Los Angeles*, 148 Cal. App. 4th 318, 324 (2007) ("The EPA does not require perfect diversity between the comparison classes, but at a certain point, when the challenged policy effects both [classes of employees] equally, there can be no EPA violation.").

### D.     Plaintiff's Fraud Claim Fails

To prove his claim for fraud, Plaintiff must show: (1) a misrepresentation; (2) made with knowledge of its falsity; (3) with the intent to induce reliance; and (4) which did induce a justifiable reliance; (5) causing damages. *Schwarzkopf v. IBM*, No. C 08-2715, 2010 U.S. Dist. LEXIS 46813, at *42 (N.D. Cal. May 12, 2010) (citing *Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc.*, No. C 06-02584 CRB, 2008 U.S. Dist. LEXIS 1658, at *25 (N.D. Cal. Jan. 9, 2008)). Here, Plaintiff claims that IBM misrepresented that his commissions would not be capped in the PowerPoints available on the Incentives Workplace. (Compl. ¶ 94.)[1] Plaintiff cannot show that IBM made false statements or that any alleged reliance by him was reasonable.

#### i.     Plaintiff cannot show that IBM made false statements.

With respect to the statements contained in the PowerPoint, Plaintiff cannot show that the statements were false. The statements Plaintiff relies upon in the PowerPoint to support his fraud claim included statements that "payments" and "earnings opportunity" are uncapped. Barnes Decl., Ex. A (Pl. Dep. 84:6-8); Compl. ¶ 94. While the PowerPoint explains that IBM does not cap sales

---

[1] Plaintiff also initially alleged in his complaint that managers at IBM told him his commissions were uncapped. However, the Court dismissed this claim. *See* ECF No. 51.

representatives' overall commissions or earnings, Plaintiff's IPL makes clear that IBM does have the right to adjust his commissions on specific transactions. Barnes Decl., Ex. A (Pl. Dep. 86:10-87:20, Ex. 6); Ex. C (Lipner Dep. 98:24-99:6). In other words, an adjustment to commissions on a specific deal is not a cap on a sales representative's overall ability to earn commissions. Indeed, Plaintiff agrees that when IBM reviews and adjusts commissions on a single deal pursuant to the Specific Transaction clause, that does not impact a sales representative's ability to earn commissions on other deals. *Id.*, Ex. A (Pl. Dep. 87:21-88:2). Plaintiff admits that IBM paid him commissions on other deals during the second half of 2017 and that his commissions were not adjusted on any of those deals. *Id.*, Ex. A (Pl. Dep. 90:9-10, 93:25-94:5). Thus, it is undisputed that Plaintiff's earnings opportunity was never in fact "capped," even where, as here, his commissions were adjusted on two deals. As a result, Plaintiff cannot show that statements in the PowerPoint were false.

### ii. Plaintiff cannot show he reasonably relied on any alleged false statements.

A fraud claim requires proof of justifiable reliance under California law. *Kenney v. Deloitte, Haskins & Sells*, No. C 91-0590 BAC, 1992 U.S. Dist. LEXIS 14600, at *6 (N.D. Cal. Sept. 1, 1992). As explained above, Plaintiff cannot demonstrate that IBM made any false representations to him. However, even if he could, Plaintiff nevertheless cannot show his reliance on allegedly false statements made by IBM was reasonable, particularly with respect to the fourth quarter HCL deal.

First, Plaintiff accepted the terms of his IPL for the second half of 2017 on July 7, 2017. Barnes Decl., Ex. A (Pl. Dep. 41:20-42:2, Ex. 6). By accepting the terms of his IPL, Plaintiff acknowledged that he read and understood the contents of the IPL. *Id.*, Ex. A (Pl. Dep. 68:25-69:15, Ex. 6). Additionally, Plaintiff admits that he read his IPL each time he received a new one. *Id.*, Ex. A (Pl. Dep. 68:25-69:15). The "Review of a Specific Transaction" clause in his IPL informed Plaintiff of the possibility that his commissions might be reduced on certain deals. *Id.*, Ex. A (Pl. Dep. 71:25-72:13, Ex. 6). Plaintiff's IPL further explained that his commissions were not considered "earned" under the IPL until after IBM completed its specific transactions review. *Id.*, Ex. A (Pl. Dep. Ex. 6). In short, Plaintiff's IPL informed him that IBM could review his

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT        Case No.: 3:18-cv-06783-WHA

commissions on specific transactions and that his commissions were not earned until any review was complete.

Second, it is undisputed that prior to the third quarter HCL deal closing, Plaintiff's first line manager Greg Mount told Plaintiff that his commissions on the third quarter deal would get reviewed. *Id.*, Ex. A (Pl. Dep. 112:2-113:25). Moreover, it is undisputed that *prior* to the fourth quarter HCL deal closing, Plaintiff was told *exactly how he was going to be paid*: he would be paid commissions based on a $2,000,000 revenue attainment as had been done on the third quarter deal. *Id.*, Ex. A (Pl. Dep. 156:6-157:7). Thus, Plaintiff cannot credibly claim he relied on the "uncapped" language, when he was fully aware prior to both deals closing that his commissions would be reviewed, and he was fully aware prior to the fourth quarter HCL deal closing that his commissions would be adjusted. At a minimum, even if the Court does not dismiss Plaintiff's fraud claim as to the third quarter deal, the fact that Plaintiff knew how he would be paid on the fourth quarter deal prior to its closing completely negates any fraud claim related to this deal.

Importantly, IBM also made it clear in Plaintiff's IPL that the disclaimers were not limited to the four corners of the IPL. In other words, the Right to Modify or Cancel section does not state that the *IPL* does not constitute a promise by IBM to make any payments. Rather, the IPL more broadly states that "[t]he ***Plan*** does not constitute…a promise by IBM to make any distributions under it" and that "IBM reserves the right to adjust the ***Plan*** terms." *Id.*, Ex. A (Pl. Dep. Ex. 6). The IPL defines "the Plan" to include all of "the Incentive Plan information" contained on IBM's Incentives Workplace, which is where Plaintiff and other salespeople could locate information about their incentive plans, *including the PowerPoint so heavily relied upon by Plaintiff in this case. Id.*, Ex. A (Pl. Dep. 69:16-70:8, 80:4-11, Ex. 5, Ex. 6). Thus, the disclaimers in the IPL applied with equal force to all of the educational materials contained on IBM's intranet, including the PowerPoint.

As discussed above, now that the Court has a fully developed record, Plaintiff's fraud claim should be dismissed. The record demonstrates that Plaintiff was fully aware that IBM would review his commissions on the HCL deals and was fully aware how he would be paid on the fourth quarter deal before it closed. *Id.*, Ex. A (Pl. Dep. 112:2-113:25, 156:6-157:7). Further, as discussed, the

19

statements in the PowerPoint and IPL are not inconsistent, but rather informed Plaintiff that his

overall earnings would not be capped, but that IBM reserved the right to review commissions on

specific transactions, as it did here.  Thus, IBM acted consistent with the statements in both the

PowerPoint and IPL.

    In summary, Plaintiff's fraud claim fails because: (1) he cannot show IBM made false

statements to him; and (2) he was repeatedly informed that IBM might review and adjust his

commissions and was told how he would be paid on the fourth quarter deal before it closed,

rendering any reliance on any alleged false statements unreasonable.  Thus, the Court should grant

summary judgment and dismiss Plaintiff's fraud claim.

**E.    Plaintiff's Negligent Misrepresentation Claim Fails**

    Plaintiff's negligent misrepresentation is premised on the same alleged misrepresentations

which form the basis for Plaintiff's fraud claim.[2]  To prove his claim for negligent misrepresentation

under California law, Plaintiff must establish: "(1) a misrepresentation of material fact; (2) without

reasonable ground for believing it to be true; (3) intent to induce reliance; (4) justifiable reliance;

and (5) resulting damage." *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 U.S. Dist.

LEXIS 48367, at *36 (N.D. Cal. June 5, 2009) (citing *Glen K. Jackson, Inc. v. Roe*, 273 F.3d 1192,

1200 n.2 (9th Cir. 2001)).

    For the same reasons set forth above with respect to his fraud claim, Plaintiff's negligent

misrepresentation claim also fails because Plaintiff cannot establish any actual "misrepresentation"

or the requisite justifiable reliance. *See supra* Section IV(D)(ii). *See also Stearns*, 2009 U.S. Dist.

LEXIS 48367 at *36-37 (dismissing negligent misrepresentation claim where it failed for the same

reasons as plaintiff's intentional misrepresentation claim).

**F.    Plaintiff's Unjust Enrichment Claim Fails**

    As a threshold matter, unjust enrichment is not available when a contract exists governing

all the claimed rights and responsibilities of the parties. *O'Connor v. Uber Techs., Inc.*, No. C-13-

---

[2] Plaintiff also initially alleged in his complaint that managers at IBM told him his commissions

were uncapped.  However, at his deposition, Plaintiff admitted that he never spoke with anyone
about the "uncapped" language in the PowerPoint prior to the deals at issue in this case. Barnes
Decl., Ex. A (Pl. Dep. 94:6-12).

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT          Case No.: 3:18-cv-06783-WHA

3826 EMC, 2013 U.S. Dist. LEXIS 171813, at *44-45 (N.D. Cal. Dec. 5, 2013); *Integrated Storage Consulting Servs. v. NetApp, Inc.*, No. 5:12-CV-06209, 2013 U.S. Dist. LEXIS 107705, at *28-30 (N.D. Cal. July 31, 2013) (dismissing plaintiff's claims for unjust enrichment where the plaintiff "agreed to terms regarding compensation under the 2008 and 2011 Agreements and the CaridianBCT Teaming Agreement."). Here, while the IPL did not create any obligations requiring IBM to pay Plaintiff more commissions than he was already paid, the IPL was a document which spelled out the parties' respective rights and responsibilities with respect to the payment of commissions. Plaintiff undisputedly agreed to a document (the IPL) which expressly gave IBM the right to review and adjust his commissions at its sole discretion, the terms of which foreclose his unjust enrichment claim. Barnes Decl., Ex. A (Pl. Dep. 41:20-42:2, Ex. 6). Indeed, Plaintiff believes the IPL is an agreement between himself and IBM. *Id.*, Ex. A (Pl. Dep. 73:13-15).

Further, because IBM retained sole discretion to determine how much to pay Plaintiff in commissions, Plaintiff cannot credibly argue that it was "unfair" or "unjust" for IBM to pay him less than what he wanted. Indeed, prior to either deal closing, Plaintiff knew his commissions on the third quarter HCL deal would be reviewed and he knew how he would be paid on the fourth quarter HCL deal. *Id.*, Ex. A (Pl. Dep. 112:2-113:25, 156:6-157:7). Given this awareness, Plaintiff cannot demonstrate he was not fairly compensated on the HCL deals.

### G.    Plaintiff's Unfair Competition Claim Fails

Section 17200 of the California Business & Professions Code prohibits four types of wrongful conduct: (1) an unlawful business act or practice; (2) an unfair business act or practice; (3) a fraudulent business act or practice; and (4) deceptive or misleading advertising. Plaintiff alleges that IBM violated the unlawful, unfair, and fraudulent prongs. *See* ECF No. 1 (Compl. ¶ 65).

#### i.    Unfair and Fraudulent Prongs.

Plaintiff claims that IBM violated the unfair and fraudulent prongs by (1) knowingly misrepresenting to Plaintiff the uncapped nature of his sales commissions and (2) willfully failing to pay all earned commissions wages to Plaintiff. *Id.* (Compl. ¶ 66). These claims rely on Plaintiff's misrepresentation and unjust enrichment claims. *Id.* (Compl. ¶¶ 567-68). As discussed above,

21

Plaintiff's claims for fraudulent and negligent misrepresentation and unjust enrichment fail. *See supra* Sections IV(D), IV(E), and IV(F). Accordingly, his claim for violation of the unfair competition law premised on the unfair and fraudulent prongs likewise fails.

### ii. Unlawful Prong.

Section 17200 can "borrow" any violation of state or federal law to satisfy the unlawful business practice test, however, the inability to prove such an underlying claim defeats claims under § 17200. *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1507 (1999). Plaintiff alleges that IBM violated the unlawful prong by violating California Labor Code Sections 200, 201, 202, 204, 221, 223, and 2751 and applicable Industrial Welfare Commission Wage Orders. *See* ECF No. 1 (Compl. ¶ 66).

Plaintiff has presented no evidence that IBM violated Labor Code Sections 200, 201, 202, 204, 221, 223, and any Industrial Welfare Commission Wage Orders. Moreover, those claims also fail on the merits:

- Section 200 is simply a definition section with no mandate for employers. *See* Cal. Lab. Code. § 200.

- Section 201 provides that upon discharge wages earned and unpaid are immediately due and payable to the employee. Cal. Lab. Code. § 201. Additionally, Section 202 applies to payment of wages to employees who have voluntarily resigned. Cal. Lab. Code § 202. It is undisputed that Plaintiff is still employed by IBM, thus Sections 201 and 202 are inapplicable. Barnes Decl., Ex. A (Pl. Dep. 11:11-21, 26:8-10).

- Section 204 provides that wages that are earned should be paid twice monthly (or once monthly if the employee is exempt under the Fair Labor Standards Act). Cal. Lab. Code § 204. Plaintiff has not alleged that he was not paid earned wages twice monthly in accordance with Section 204. It is undisputed that Plaintiff's IPL provides that commissions are considered earned only after the measurement of complete business results following the end of the full-Plan period. Barnes Decl., Ex. A (Pl. Dep. Ex. 6). Thus, Plaintiff did not earn any commissions that were subject to review until the review was completed. Accordingly, his claim for violation of Section 204 fails.

-   Section 221 makes it unlawful for an employer "to collect and receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Labor Code § 221. "An employee's 'wages' or 'earnings' are the amount the employer has offered or promised to pay, or has paid pursuant to such an offer or promise, as compensation for that employee's labor." *Kemp v. IBM*, No. 3:09-cv-03683, 2010 U.S. Dist. LEXIS 118801, at *13 (N.D. Cal. Nov. 4, 2010) (citing *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 228 (2007)). Commissions can qualify as wages under Section 221, but as this Court noted in *Kemp*, "the right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." *Id.* (citations omitted.) After evaluating the disclaimers in plaintiff's incentive plan letter, which are nearly identical to the disclaimers in Plaintiff's IPL, this Court in *Kemp* held that plaintiff's claim under Section 221 failed because the terms of the IPL make it clear that IBM had no obligation to pay plaintiff any additional commissions beyond what it already paid in light of the discretion IBM retained in the IPL. *Id.* at *14. A claim under Section 221 requires some showing that Plaintiff is contractually entitled to commissions he claims he was denied. *Id.* at *15. Here, while the IPL was an agreement between Plaintiff and IBM which spelled out their respective rights and responsibilities relating to commissions payments, the terms of the IPL make it clear that IBM had no obligation to pay Plaintiff additional commissions beyond what it already paid him. Thus, Plaintiff's Section 221 claim fails.[3]

-   Section 223 provides, "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." Cal. Lab. Code § 223. Here, there is nothing "secret" about what IBM agreed to pay under the IPL. Moreover, the IPL does not "designate" a wage that IBM failed to pay Plaintiff or otherwise create any contractual obligation by IBM to pay additional commissions. On the contrary, the IPL provides IBM with the discretion it exercised to review and adjust Plaintiff's commissions. Therefore, IBM did not violate Labor

---

[3] The Court previously dismissed Plaintiff's standalone claim for violation of Section 221. *See* ECF No. 51, at p. 8.

1    Code Section 223.[4]

2    -   Plaintiff also claims that IBM violated "the applicable Industrial Welfare Commission Wage

3        Orders" but has presented no evidence as to what specific orders IBM violated.  All Plaintiff

4        provides are bald assertions that IBM violated the law.  This is insufficient to survive summary

5        judgment.  *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("[B]ald assertions or a mere

6        scintilla of evidence in his favor" will not suffice). (citation omitted).

7            Plaintiff also rests his unlawful prong violation on Labor Code Section 2751, which

8    provides, in pertinent part, "Whenever an employer enters into a contract of employment with an

9    employee for services to be rendered within this state and the contemplated method of payment of

10   the employee involves commissions, the contract shall be in writing and shall set forth the method

11   by which the commissions shall be computed and paid."  IBM's IPL complies with this

12   requirement.  The IPL is in writing, and it explains, in extensive detail, the manner in which

13   commissions are calculated and paid.  Barnes Decl., Ex. A (Pl. Dep. Ex. 6.)  Plaintiff signed his

14   IPL, indicating that he read, understood, and accepted its terms, additionally, his IPL was

15   acknowledged by IBM HR. *Id.* Additionally, as Plaintiff admits, the IPL is an agreement between

16   IBM and Plaintiff. *Id.*, Ex. A (Pl. Dep. 73:13-15). Simply because IBM reserves the right to adjust

17   commission payments in certain circumstances as specified in the IPL does not mean IBM has no

18   obligations under the IPL. *Id.*, Ex. C (Lipner Dep.124:11-126:3, 126:24-128:22).  The IPL is an

19   agreement between IBM and its sales representatives that obligates IBM to pay sellers pursuant to

20   the terms of the IPL, but IBM's rights under the terms of the IPL include the right to adjust

21   commissions on specific transactions. *Id.*, Ex. C (Lipner Dep.124:11-126:3, 126:24-128:22); Ex. A

22   (Pl Dep. 73:13-15); Ex. J (Nunez Dep. 20:17-23:6). Further, the phrase in the IPL "The Plan does

23   not constitute an express or implied contract or promise by IBM to make any distributions under

24   it" does not mean IBM had no obligations at all under the IPL, it simply means IBM did not have

25   any contractual obligations to pay any particular amount in commissions in light of the disclaimers

26   in the IPL.

27

28   _____
     [4] The Court previously dismissed Plaintiff's standalone claim for violation of Section 223. *See* ECF
     No. 51, at p. 8, n.4.

Nor has Plaintiff offered any evidence that he was harmed by any alleged violation of Section 2751, which is fatal to his claim. To prevail on a claim under Section 17200 predicated on "unlawful" conduct, Plaintiff must, of course, first prove that he has standing to assert a claim under Section 17200. In 2004, California's UCL was amended to limit standing to assert a claim under Section 17200 to those individuals who (1) have suffered a loss or deprivation of money or property sufficient to qualify as an injury in fact (*i.e.*, economic injury), and (2) could show that the economic injury was caused by the defendant's unlawful conduct. *Animal Legal Defense Fund v. LT Napa Partners LLC*, 234 Cal.App.4th 1270, 1279 (2015). Causation is an essential element of standing, and a plaintiff must be able to prove the causal link between the alleged unlawful act and the economic injury if he is to have standing to assert a claim under Section 17200. *Id*; *see also Hall v. Time Inc.*, 158 Cal.App.4th 847, 855 (2008) (concluding that the second prong of the test for standing imposes a causation requirement). "Because standing goes to the existence of a cause of action, lack of standing may be raised by demurrer or at any time in the proceeding, including at trial or in appeal." *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1345 (2009).

Even if Plaintiff could show that his IPL failed to comply with Section 2751, he has offered no evidence that any alleged failure to comply with Section 2751 caused him any harm. Thus, Plaintiff is unable to establish that IBM violated the Unfair Competition Law. Notably, this Court previously dismissed the Unfair Competition Law claim against IBM asserted in the *Schwarzkopf* case. *Schwarzkopf*, 2010 U.S. Dist. LEXIS 46813, at *46-48.

## V.  CONCLUSION

For the foregoing reasons, IBM respectfully requests that the Court grant its Motion for Summary Judgment and dismiss this action in its entirety.

Dated: February 27, 2020                                  JACKSON LEWIS P.C.

By:     /s/ *Justin R. Barnes*
           Mitchell F. Boomer
           Donald P. Sullivan
           Justin R. Barnes
           Kelli N. Church
           Attorneys for Defendant
           INTERNATIONAL BUSINESS
           MACHINES CORPORATION