1  Matthew E. Lee (*pro hac vice*)
   Jeremy R. Williams (*pro hac vice*)
2  **WHITFIELD BRYSON & MASON, LLP**
3  900 W. Morgan Street
   Raleigh, NC 27603
4  Telephone:    919-600-5000
   Facsimile:     919-600-5035
5  matt@wbmllp.com
   jeremy@wbmllp.com
6
7  [ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

8  Attorneys for Plaintiff

9                 UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
10

11                                    )
                                      )   Case Number: 3:18-cv-06783-WHA
12  JEROME BEARD,                     )
                                      )      **PLAINTIFF JEROME BEARD'S**
13              Plaintiff,            )      **OPPOSITION TO DEFENDANT'S**
                                      )    **MOTION FOR SUMMARY JUDGMENT**
14        v.                          )
                                      )   Date:   April 2, 2020
15                                    )   Time:   8:00 a.m.
16  INTERNATIONAL BUSINESS            )   Ctrm.:  12, 19th Fl.
    MACHINES CORPORATION,             )   Judge:  Hon. William Alsup
17                                    )
                                      )   Complaint Filed: November 8, 2018
18              Defendant.            )   Trial Date: June 1, 2020
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 2

I.      STATEMENTS OF ISSUES TO BE DECIDED ............................................. 2

II.     INTRODUCTION AND SUMMARY OF ARGUMENTS ............................. 2

III.    FACTS ................................................................................................................ 2

     A.  IBM promised Beard "uncapped" commissions ................................. 2

     B.  Beard closed a large ESA deal for IBM with HCL in 2016 ................ 4

     C.  Beard closed two more large deals for IBM with HCL in 2017 .......... 5

     D.  IBM "capped Beard ............................................................................. 6

          i.   W3 HCL deal cap ................................................................ 6

          ii.   Q4 HCL deal cap ............................................................... 10

          iii.  IBM's Open Door Investigation ....................................... 11

     E.  Internal IBM emails, and IBM's own testimony, show that IBM "capped" Beard .... 13

     F.  IBM admitted that Beard was reasonable in actually relying on the PowerPoint's promise not to cap ............................................... 13

     G.  IBM admitted that the testimony in the Choplin Depositions remains true ............... 14

IV.   ARGUMENT AND CITATION TO AUTHORITY ..................................... 14

     A.  This Court's Prior Orders, and the Orders in *Swafford*, Are Directly On Point to the Non-Discrimination Claims ........................ 14

     B.  The Fair Employment and Housing Act Claim Requires a Jury ................. 14

          1.   Beard has established a prima facie case of race discrimination because two white salesmen on his team were capped when he was .... 14

          2.   IBM has not shown a legitimate, non-discriminatory reasons for its actions because its shifting justifications all violated IBM policy .... 16

     C.  The Equal Pay Claim Requires a Jury .............................................. 16

i

D.  The Fraud Claim Requires a Jury...................................................................... 18

    1.  The representation that IBM did not and would not "cap" was false .................. 18

    2.  Beard reasonably relied on the "no capping" representation ............................... 20

E.  The Negligent Misrepresentation Claim Requires a Jury ........................................... 22

F.  The Unjust Enrichment Claim Requires a Jury........................................................... 22

G.  The Unfair Competition Claim Requires a Jury......................................................... 23

    1.  The unfair and fraudulent prongs require a jury.................................................... 23

    2.  The unlawful prong requires a jury ...................................................................... 24

V.       CONCLUSION ....................................................................................................... 26

CERTIFICATE OF SERVICE........................................................................................... 28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT        Case No. 3:18-cv-06783-WHA

## **TABLE OF AUTHORITIES**

*Belloni v. Roman Catholic Archbishop of San Francisco*,
    2015 WL 106587 (N.D. Cal. 2015)....................................................................... 16

*Culver v. Qwest Communs. Corp.*,
    306 Fed. Appx. 403, 405 (9th Cir. 2009) ............................................................. 16

*E.E.O.C. v. Timeless Investments, Inc.*,
    734 F. Supp. 2d 1035, 1063 (E.D. Cal. 2010)...................................................... 16

*Earl v. Nielsen Media Research, Inc.*,
    658 F. 3d 1108, 1116 (9th Cir. 2011)................................................................... 14

*Green v. Par Pools, Inc.*,
    111 Cal. App. 4th 620, 624 (2003)....................................................................... 17

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778, 783 (9th Cir. 2001)........................................................................ 26

*In re Lansford*,
    822 F.2d 902, 904 (9th Cir. 1987)........................................................................ 20

*Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*,
    No. 5:12-CV-06209-EJD, 2013 WL 3974537 (N.D. Cal. July 31, 2013)........................ 23

*Kemp v. Int'l Bus. Machines Corp.*,
    No. C-09-4683 MHP, 2010 WL 4698490, (N.D. Cal. Nov. 8, 2010) .............................. 24

*Lett v. Paymentech, Inc.*,
    81 F. Supp.2d 992, 994 (N.D. Cal. 1999) ........................................................... 25

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718, 731 (9th Cir. 2007)........................................................................ 23

*O'Connor v. Uber Techs., Inc.*,
    No. C-13-3826 EMC, 2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) ............................... 23

*Piccarreto v. Presstek, LLC*,
    2017 U.S. Dist. LEXIS 137255 (C.D. Cal. August 24, 2017) ..................................... 25,26

*Swafford v. IBM*,
    No. 5:18-CV-04916-LHK (N.D. Cal.) ..............................................................*passim*

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
    10 Cal. App. 5th 56, 78, (2017)............................................................................ 21

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT        Case No. 3:18-cv-06783-WHA

Statutes

California Labor Code § 221 ........................................................................ 24

California Labor Code § 223 ..................................................................... 24,25

California Labor Code § 2751 .................................................................. *passim*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     STATEMENT OF ISSUES TO BE DECIDED**

IBM adequately states the issues to be decided.

**II.     INTRODUCTION AND SUMMARY OF ARGUMENTS**

Discovery in this case has shown that the key allegations in Plaintiff Jerome Beard's Complaint are undisputely true. Defendant IBM has raised supposed defenses to those allegations—such as whether the Specific Transaction Provision applies—but those defenses are legally irrelevant. But even if the Court were to consider those defenses, the facts in the light most favorable to Beard provide no support for them.  This is not a close case.

**III.     FACTS**

IBM's recitation in its brief of the facts is both incomplete and (improperly) in the light most favorable to IBM. Below is a complete recitation in the light most favorable to Beard.

**A.     IBM promised Beard "uncapped" commissions.**

Beard is an experienced software sales employee at IBM.  (Beard 15-27).[1] Beard is also an African American. (Mulada 239). He has twice received "The Best of IBM," one of IBM's highest honors given to a small percentage of IBM employees for "extraordinary contribution". (Ex. 101). At IBM, he was assigned to sell Embedded Solution Agreements, or ESAs, which are contract vehicles IBM uses to license its software to other technology companies. (Beard 28-29). His compensation consisted of a base salary paired with commissions. (Beard 31). His commission plan for the second half of 2017 ("2H 2017") ran from July 1, 2017 through December 31, 2017. (Beard 41-42; Ex. 6). Early in 2H 2017, IBM offered the written (electronic) commission plan to Beard (the "IPL"), which contained objective quotas and commission percentages. (Beard 41; Ex. 6).[2] The IPL states that "[t]he Plan does not constitute an express or implied contract or a promise

---

[1] References to deposition testimony taken in this case are cited as "[deponent] [page numbers]"—for example, "Mount 70-71."  References to deposition exhibits are cited as "Ex. [deposition exhibit number]"—for example, "Ex. 23."  Beard has attached three exhibits to this response that were not deposition exhibits, and those are cited as Exhibit A through C.

[2] IBM actually has commission plans based on a subjective analysis of a sales employee's efforts as compared to that of other people on the team, where the team splits a set "pool" of (footnote continued)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

1    by IBM to make any distributions under it." (Ex. 6).  One of IBM's witnesses, Inhi Cho Suh, is an

2    attorney and testified that, based on that language, the Plan is not a contract. (Suh 114-16).

3         Around the time that Beard accepted the IPL, IBM presented to him and similar

4    salespeople a PowerPoint presentation describing the terms of the commission plan being offered

5    to them. (Ex. 5; Beard 80-81; Mount 44-46). IBM made this and a substantially similar version of

6    this PowerPoint available to Beard each commission period for the purpose of explaining the

7    important terms of his compensation. *Id*.

8         The PowerPoint was titled "Your 2017 Incentive Plan"/"Updated July 2017" and, on the

9    first page, it stated that "[t]his incentive plan Quickview presentation is the *primary 2017*

10   *education* for IBM sales employees and managers. It covers the information you will need to

11   understand your 2017 plan."  (Ex. 5) (emphasis added).  Page 5 noted that IBM had studied its

12   competitors and the market "to ensure that our incentives plans were competitive, if not best-in-

13   class." (*Id.*) Page 8 is a slide entitled "Incentive Plan Types – Global Framework," and the

14   narrative on the bottom half of the page describes different plan types, including Beard's

15   Individual Quota Plan ("IQP"). (*Id.*) For IQPs, it stated: "[m]anagers are required to assign a

16   territory and quota for each seller on an individual quota plan. Seller earnings for these plans are

17   uncapped and the plan is paid based upon achievement results rather than on an assessment of

18   employee contribution." (*Id.*) (red text in original).[3] Page 11 specifically stated "payments

19   uncapped," and page 14 specifically stated "[e]arnings opportunity remains uncapped." (Ex. 5). In

20   fact, over half of the presentation's slides, 14 of 27, say that "payments" and/or "earnings

21   opportunit[ies]" are uncapped.  (Ex. 5).  Beard viewed that PowerPoint and specifically its

22   promise not to "cap," he relied on it to believe that his commissions would not be capped, and in

23   _____

24   commissions, but Beard was not on such a plan. (Ex. 5, p. 8; Mount 56). For that reason, some of
     the IPL language does not apply to Beard—*e.g.*, the "Management-Assessed Payments" provision,

25   which by its terms applies only to "pool funded" plans. (Ex. 6).

     [3] Since contribution is not a factor for Beard's payments, just like with the pool language cited in

26   footnote 2, contribution-related language in the "Review of a Specific Transaction" provision of
     the IPL cannot apply to Beard. (Ex. 6; Ex. 41; Kingston 65-69). Beard's manager, Greg Mount,

27   agreed. (Mount 99-103).

28
                                                    3

1    his thirty years at IBM had always been paid in full no matter the size of the commissions. (Beard

2    80; 84; 107-108). The reason that IBM doesn't cap commissions is to "drive revenue growth;"

3    having uncapped commissions is motivating for sales employees "because if they overachieve

4    then they get paid more." (Suh 116-117); *see also* (Mount 50, Copeland 255).

5         There are other important facts about the PowerPoint: (1) the PowerPoint had key

6    information about commissions that was not in the IPL, and it had more specific information than

7    the IPL (*compare* Ex. 6 to Ex. 5);[4] (2) IBM itself has testified that the PowerPoint contains "the

8    most detailed information" about a sales employee's commission plan (Dkt. No. 1-1, p. 72); (3)

9    IBM wants salespeople to read the PowerPoint and agrees that it's fair for them to believe that the

10   information in it is true (Lipner 72-73)[5]; (4) a written note under one slide stated that commission

11   "measurements must be ledger-based and auditable," meaning based on objective criteria (Ex. 5,

12   p. 8; Mount 53); (5) neither this PowerPoint nor any other PowerPoint made any reference to the

13   provisions in the IPL on which IBM tries to rely (Lipner 74); (6) despite the issue of these

14   inconsistent representations coming up over and over in litigation and otherwise, IBM's Vice

15   President of Global Sales Incentives, the department that developed the PowerPoint, had no idea

16   why IBM did not include a reference to any potential commissions review or the Specific

17   Transactions Provision in the "primary education" PowerPoint (Lipner 74-77); and (7) in order to

18   address its failure to educate sales employees about commission reviews, IBM did not simply add

19   a slide about that, rather, IBM deleted the "uncapped" representations from the 2018 PowerPoint

20   (Lipner 78, 84), but it testified that commissions are, nevertheless, still "uncapped" (Lipner 70).

21        **B.**    **Beard closed a large ESA deal for IBM with HCL in 2016.**

22        In 2015, Beard began calling on HCL Technologies ("HCL") and working on ESA deals

23   for IBM that complemented the sale of Intellectual Property (referred to as IP partnerships or IPP).

24   (Beard 46, 57). By the time the two 2017 HCL deals at issue arose, Beard had worked on four or

25   —————————————
      [4] For example, the "accelerators"—increased rates of payout for sales over certain amounts—are

26   contained in the PowerPoint but not the IPL. (Lipner 57-58).
      [5] Maria Lipner is the Vice President of Global Sales Incentives at IBM, "a very powerful person."

27   (Mount 58).

28
—————————————————————————————————————————
PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT     Case No. 3:18-cv-06783-WHA

1   five ESA/IPP deals, one of which was a foundational deal with HCL in June 2016. (Beard 55-56).

2   That deal included about $30 million for IPP and $1.2 million for ESA. (Beard 56). Beard was

3   praised for his work with HCL by an IBM Intellectual Property Director, Lynne Driscoll, saying

4   he was a key member of the team, showed creativity and professionalism, and that the entire $350

5   million deal could have been at risk without his work. (Ex. 96). Beard was paid in full on each of

6   those deals and his commissions were not capped or adjusted. (Beard 107-08).

7   **C.    In 2017, Beard closed two large deals for IBM with HCL.**

8   Beard was part of a small number of IBM employees who closed two deals with HCL in

9   2H 2017 worth over $100 million for IBM, one in Q3 and one in Q4. (Johnson 150; Ex. 16;

10  Mulada 161; Ex. 84, p. 8). Beard was the only commissioned sales employee who worked directly

11  on both deals. (Ex. 16; Ex. 84, p. 4). Beard had many other deal opportunities that he could have

12  pursued, but he couldn't work on much of anything other than HCL in 2H 2017. (Beard 91).

13  The Q3 deal had a Nondisclosure Agreement ("NDA"), meaning few knew about it.

14  (Mulada 121). The Q4 deal was not covered by an NDA. (Ex. 55, p. 10). Beard worked hard and

15  did everything that was asked of him. (Suh 171; Nunez 102). HCL is very difficult to work with.

16  (Mulada 217). Still, Beard had been working with HCL for many years and had developed a

17  pipeline of large potential sales opportunities to leverage for IBM. (Beard 46-47). Internal

18  communications referred to Beard as the "dealmaker." (Ex. 97). Both of these deals were complex

19  and were driven by a "massive effort" by Beard. (Ex. 10). The HCL transactions were "two of the

20  most complicated, stressful, intense and exhausting deals" Beard had ever worked on. (Ex. 55, p.

21  3). During this time, his "first-line" (i.e., immediate) manager was Greg Mount, his "second-line"

22  (i.e., two levels up) manager was Scott Kingston, and his "third-line" (i.e. three levels up) manager

23  was Dave Mitchell. (Mount 26; Beard 149, 174). Beard's managers believed that IBM would not

24  have completed the HCL deals without Beard. (Mount 137). Kingston said that the Q4 deal "was

25  absolutely the most difficult ESA deal I've seen and [Beard's] role was critical." (Ex. 37).

26  Kingston continued that "this is extremely grueling work. [Beard] was in the fray away from home

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

for over two weeks, literally working nearly 24 hours per day. From start to finish, it's been weeks, and is still going on. (there is a ton of work even after it closes…)." *Id.*

The Q3 deal was a total of $100 million to IBM, with $80 million in IP and $20 million ESA (Ex. 16; Mulada 161); and the Q4 deal was $15 million, all ESA. (Ex. 84, p. 8).

**D.   IBM "capped" Beard on those two large deals.**

Beard's efforts in closing the HCL deals resulted in second half revenue numbers for him well in excess of his $934,736 quota. (Exs. 6, 17). No one identified any problems with Beard's quota or how it was set. (Lipner 162).

*i.   Q3 HCL deal cap*

The Q3 deal closed on September 30, 2017 and, as of October 27, 2017, based on Beard's actual sales of $12,843,886.28 up to that point, Beard had "earned" $1,465,670.06 in commissions. (Ex. 17; Lipner 151-52). (IBM wrote on October 8 that roughly $13 million was "earned in the ledger." (Ex. 35).)  The accelerators chart showed that a 2x factor would apply up to maximum sales of 10,000 percent of quota. (Ex. 17; Lipner 154-55). Beard could read that and expect, reasonably, that his commissions were unlimited. (Ex. 17; Lipner 154-55).

IBM has a process for internally reviewing commissions before they are paid. (Lipner 50-53). This is a written process with standard procedures. (Lipner 181). The commissions team in Brazil first checks for errors itself and then, with large commissions payments, sends emails to the first, second, and third-line managers asking them to identify "territory quota or other issues" where an error could have occurred. (Lipner 50-53). If the managers do not identify a "problem area" or "something wrong" with the territory or quota, "then the payment should flow." (Lipner 52-53). On October 18, 2017, IBM's commissions team in Brazil sent a review request to Mount for Beard's achievement on the Q3 HCL deal of $12.8 million; Mount confirmed that it was correct. (Ex. 50; Mount 62-65). The next day, Kingston did the same. (Ex. 44; Mount 67; Kingston 129). With that, the team in Brazil needed third-line manager Mitchell's "approval in order to release final payment" to Beard of $1.46 million. (Ex. 8-A, p. 3; Mitchell 220). Brazil sent him an email on October 19, 2017 and Mitchell responded the same day: "I approve – [please]

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

proceed with the full payment." (Ex. 8-A, p. 2; Mitchell 220). At that point, the review process was complete and all managers had approved the full payment. (Lipner 175-76). There was nothing unorthodox or inappropriate about this review process. (Lipner 181-82). If Brian Mulada, IBM Solutions COO/CFO, had not intervened, Beard would have been paid in full. (Lipner 163). Mulada intervened because he wanted Beard's "payment to be commensurate with contribution," which is no different than "believing that [Beard's] payment was too high." (Lipner 184).

Unbeknownst to Beard, Mulada had sent an email to Lipner, the head of Incentives and Commissions, on October 7, 2017, asking her to make sure that the Q3 HCL deal was "carved out" of the normal commissions process. (Ex. 16; Mulada 128, 132). Lipner pushed back, telling him that at IBM "[s]ellers benefit from the blue birds [large transactions]" and that "[c]ontribution is not part of the process." (Ex. 16; Lipner 141). When she said that, Lipner meant that IBM pays "based on the information that flows and the achievement of the transactions." (Lipner 144-45). "Achievement" means sales, and that is not a subjective determination. (Lipner 73-74).

Nevertheless, Mulada insisted that commissions not be paid normally and began a process that purported to set "achievement based on effort" for Beard for the Q3 HCL deal. (Lipner 169). Directly contrary to the written guidance in the PowerPoint, contribution apparently *was* a factor in this process. (Lipner 169; Ex. 5, p. 8). There are no guidelines at IBM for how to do this, or to ensure fairness, and Lipner didn't know how a seller could be sure that IBM would be fair. (Lipner 190, 192; Johnson 70). But, IBM does admit one guideline: it would be inappropriate to just decide what the payment should be. (Lipner 137-38). Lipner brought in Karla Johnson, a Director in Sales Incentives, to assist Mulada. (Lipner 156). Johnson told Mulada that the decision needed to be made based on "contribution against quota" and not something designed to reach a certain payment amount. (Johnson 65-66).  But she does not know whether that is actually what Mulada did. (Johnson 65).

There is significant evidence that Mulada made the decision based on what the total payment would be and capped Beard in violation of IBM's policy. Mulada made the decision about how much Beard should be paid for the Q3 HCL deal. (Mulada 174; Suh 57-58). Mulada

7

asked Lipner and Johnson to "tell me the payout [to Beard]" under different percentages of his quota, ranging from 100% to 300%. (Ex. 20-A). While Johnson had recently instructed her team not to send payment information to finance people like Mulada (Ex. 78, p. 10), she still sent the information (Ex. 20-A). But she could see where he was going and reemphasized that "[w]e have the most legal risk when the decision is based on some expense level or dollar amount." (Ex. 20-A). Mulada responded by asking what the payment would be if the sale amount was set at $2 million. (Ex. 20-A). Johnson didn't know specifically why Mulada was focused on what the payout would be. (Johnson 181). Kingston was told that IBM had "reviewed [Beard's commissions] and decided that it's just too much money … They are not going to pay it." (Kingston 46). Later, after an internal investigation, Nancy LaCivita in IBM HR found a "potential conflict of interest" with Mulada being one of the decision-makers on Beard's HCL commissions. (Ex. 7; LaCivita 145-150).[6]

Neither Mulada (nor anyone else) ever asked Johnson (nor anyone else) how an analysis of Beard's contribution should be conducted. (Johnson 66). Mulada claimed that he and IBM executive Inhi Cho Suh made the decision together. (Mulada 174). Suh testified that she has never made a decision about how much someone should be paid in commissions, including here, and that she only gave guidance that HCL was an unusual deal and should be reviewed. (Suh 57-59).[7] Mulada has never been in a sales role. (Mulada 178). Mulada does not make decisions about commissions as a normal part of his job, he had only done that once before HCL, and that instance was not a sale. (Mulada 89-91). When he made this decision, Mulada did not look at commissions that had been paid on other ESA deals in the past. (Mulada 177). Mulada thought the Q3 ESA deal was "unique" because it was bundled with an IPP deal. (Mulada 177). Mulada knew that Beard was African American. (Mulada 239-240).

---

[6] LaCivita knew of no basis in IBM policies or guidelines for someone in finance to be involved in the determination of commissions for a sales employee. (LaCivita 150).

[7] Suh thought that someone on Lipner's team made the decision, but couldn't recall who. (Suh 58). Karla Johnson was the only person on that team involved other than Lipner, and she was clear at her deposition that she did not and would not make the decision as to how much Beard should be paid for the HCL deals. (Johnson 43).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

1    Before he learned how much Beard had earned in commissions, Mulada acknowledged

2   that Beard was a major contributor and one of three people who made the deal happen: "[t]his was

3   a deal closed directly by [Inhi Cho Suh]/Sean Flynn/Jerome Beard." (Ex. 16; Mulada 129).

4   Mulada also described the HCL deal as: "identified, sold, and executed by senior leadership and

5   [Beard]" (Mulada 180) and "sold exclusively by Inhi Cho, Sean Flynn, and Jerome Beard,

6   (Mulada 133; Ex. 16). On November 9, 2017, Mulada told Johnson that "there should be no big $

7   beyond [Beard]"; she responded "really depends on their quota"; and he replied "i got that. i am on

8   what it should be." (Ex. 26, p. 13).

9    Mulada learned on November 11, 2017 that Beard was owed about $1.46 million in

10   commissions and that his managers earlier had approved the full payment. (Ex. 21). About 15

11   minutes before that, he'd included Beard, as he did consistently, when he said who was

12   responsible for the deal. (Ex. 27). Now, Mulada was "upset" about Beard's payment and he

13   discussed that with Suh. (Suh 158; Ex. 27). Mulada called it "inappropriate and unacceptable

14   given the nature of this transaction." (Ex. 21). The next morning, November 12, 2017 at 9:10 a.m.,

15   Mulada responded to Johnson with his decision on Beard's commissions: "for those who were part

16   of the team working the deal, we will flow [$2 million] of commissionable revenue. This is based

17   on the nature of this deal being identified, developed, and sold by senior non-commissionable

18   leadership." (Ex. 28, p. 2). Beard is not "senior non-commissionable leadership," and this was the

19   first time that Mulada had not included Beard in the short list of those who drove the deal. (Suh

20   168-69). Mulada also did not say that his decision was based on Beard's effort or contribution.

21   (Ex. 28). Johnson responded by reminding him about that; he replied, "I don't understand all this

22   stuff below, including timing/deadlines," and his decision did not change. (Ex. 28; Suh 169-73).

23   Beard found out on November 16 that IBM was capping him at $2 million in sales, reducing his

24   $1.46 million payment down to $205,286. (Beard 131-32; Ex. 55, p. 10; Ex. 45, p. 3).

25    Mulada estimated his own 2017 salary and bonus at $301,000; Suh estimated her own

26   2017 compensation at $780,000. (Suh 55-56). Both Suh's and Mulada's bonuses are influenced by

27   commissions because commissions are a "sales expense" that factors into the performance of the

28

9

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-06783-WHA

1  business unit. (Mulada 48-55; Suh 55-56). Changing the commissions also made the deal more

2  profitable for IBM. (Suh 101).

3      Suh believed that if a deal was unusual, sales employees may have their commissions

4  "capped" at IBM. (Suh 112). Yet, she also testified that sales employees should believe that their

5  commissions are "uncapped." (Suh 117). Suh agrees that IBM is clear that contribution is not a

6  factor for IQPs (Suh 160), but she also thinks that sometimes contribution is a factor (Suh 159).

7  IBM says that it has a "culture of integrity," and that's part of why employees want to work at

8  IBM. (Suh 125). Trust in all relationships, including those between IBM and its employees, is

9  important to IBM. (Suh 124). IBM sales employees should be able to count on an accurate,

10  complete, and honest statement about how they will be paid. (Suh 122).

11      It is important for IBM sales employees to know how they will be paid and whether

12  commissions on big deals could be changed or adjusted. (Suh 120). When the PowerPoint says

13  that "Seller earnings for these plans are uncapped, and the plan is based upon achievement results

14  rather than on an assessment of employee contribution," that is a true and important statement.

15  (Suh 120; Ex. 5, p. 8).  If that statement was false or omitted any important information, that

16  would be "wrong" at IBM. (Suh 127; Ex. 102 (Suh)).

17      When Beard's counsel asked Lipner, head of commissions, whether sales employees are

18  able to trust IBM, she said "I don't know." (Lipner 105).

19          *ii.    Q4 HCL deal cap*

20      The NDA was, ostensibly, what made the Q3 HCL deal "unique" (Lipner 120), but the Q4

21  deal was not subject to an NDA and was still handled the same way. (Johnson 237). Still, Mulada

22  decided to cap Beard's commissions again. (Mulada 217). He capped Beard in the exact same

23  amount as in Q3 (achievement of $12 million cut to $2 million). (Mulada 217; Ex. 55, p. 10).

24      There is little evidence of any deliberative process separate from the Q3 deal regarding

25  Beard's "effort" or "contribution" to the Q4 deal. (Ex. 84; Johnson 232-50). Johnson testified that

26  there should have been a process involving someone with "visibility to Jerome's contribution" to

27  the Q4 deal. (Johnson 248). Even before the deal was closed, on November 21, 2017 Mulada and

28

10

Rose Nunez, IBM Channels Director, were discussing capping the Q4 sales amount at the same level as Q3 (200%-250%). (Ex. 30). Nunez said "we need to tell [Beard]" about the Q4 cap. (Ex. 30; Nunez 95-96). Despite IBM telling Beard about the Q3 cap on November 16, 2017 (Ex. 55, p. 10), Nunez wanted to make sure on November 21, 2017 that a Q4 cap "didn't come as a surprise to the sales teams." (Ex. 36; Nunez 98). IBM refused to say anything, stating that "setting a predefined cap is not consistent with the design and terms within our plan." (Ex. 36; Nunez 98).

On January 5, 2018, Mario Vaz, IBM Vice President of Finance for Watson Customer Engagement, sent Johnson an email about holding commissions on the Q4 deal. (Ex. 84). Vaz and Mulada both work in finance, have worked in the same building, and know each other. (Johnson 231-32). Although Mulada was not even involved in the Q4 deal, he inserted himself into the situation to make sure that IBM was handling commissions on "the big Q4 HCL deal similar to how we handled in Q3…" (Ex. 31; Mulada 223-26). Although the Q3 and Q4 deals were different, IBM capped Beard on the Q4 deal at the exact same amount. (Ex. 55, p. 10). Beard was told that "the same folks who decided to cap the [Q3 deal] also decided to cap the [Q4 deal] in the same exact way." (Ex. 55, p. 10). The total ESA deal was worth $15 million and Beard was supposed to get credit for $12 million, but IBM capped it at $2 million, reducing Beard's payment from $1.44 million to $205,286. (Ex. 55, p. 10).

Beard's counsel asked Johnson, who was heavily involved in the decisions about Beard's commissions on both the Q3 and Q4 HCL deals, what the basis for IBM's decision was. (Johnson 72-74). Johnson testified that the Specific Transaction Provision of the IPL was the basis for the "special handling" of the entire sales team, but not Beard. (Johnson 73). The basis for IBM's decision for Beard was "the type of deal and the structure of the deal and how the deal came about," and the Specific Transactions Provision had nothing to do with it. (Johnson 73-74).

### iii.   IBM's Open Door Investigation

Beard later requested that IBM investigate what had been done with his commissions because it violated IBM policy and smacked of racial discrimination. (Ex. 7). IBM calls this an "Open Door." (Ex. 45, p. 3). In the request, Beard noted how two white sales employees on his

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

team, Bill Beroza and Nick Donato, had been treated very differently on big ESA deals in 2017; namely, they had been fully paid while he was paid 15% of the commissions that he was owed. (Ex. 7; Ex. 55, p. 3). Beroza said that Beard was treated differently because he is African American. (Beard 133-34). Beard later learned that his manager, Kingston, complained that capping Beard's commissions when other white ESA sale employees were not capped on big deals looked like racial discrimination. (Kingston 167-68). IBM fired Kingston shortly after that, in April 2018. (Kingston 27). IBM's explanation for the discriminatory treatment was, essentially, that Donato *should not* have been paid anything[8] and Beroza *should* have had a "share of credit approach," even though both contributed to their respective deals. (Johnson 157, 254-59). IBM claimed to be initiating "corrective action" on Donato. (Ex. 96, pp. 13-14). However, IBM's witnesses didn't even know whether IBM had contacted Donato. (Johnson 264; LaCivita 120-21).

IBM underpaid Beard by a total of $2,491,234. (Ex. 55, p. 10; Mulada 217). That money was not shifted to another sales employee—rather, it lowered IBM's expenses and probably helped with profit. (Mulada 218-219; Suh 101). IBM had never capped, modified, or changed Beard's commissions in any way before. (Beard 31-32). Mitchell had never heard of a "large transaction review process" at IBM, had never had large transactions go through that before, and didn't know when it might arise. (Mitchell 162-64). Kingston had never had commissions reduced for a sales employee on his team in 18 years at IBM. (Kingston 32). Mount had one sales employee's commissions changed 10-12 years ago, but, even though there was "windfall" language in the IPL then, the employee was upset and contested it, and he was paid more. (Mount 76-80). Mount had never even been asked to validate achievement like he was with Beard. (Mount 67).

---

[8] IBM executives on Donato's deal said that he "SHOULD get paid for this deal." (Ex. 90, p. 11; Johnson 269).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-06783-WHA

**E.     Internal IBM emails, and IBM's own testimony, show that IBM "capped" Beard.**

IBM consistently referred to what was being done to Beard as a "cap." (*E.g.*, Ex. 29 ("Make sure these 'caps' are known up-front going forward" "if we cap this"); Ex. 30 ("attainment capped" "attainment will be capped"); Ex. 7, p. 22 ("maybe we cap"); Ex. 45 ("[Bill] was not capped for his…smaller deal"); Ex. 46 ("concept of a cap"); Kingston 74 ("and in those conversations, [we discussed] the idea that [Beard's] earnings should be somehow capped related to his effort")). Mount didn't have any problem using the term "capped" in the context of what IBM did with Beard's commissions. (Mount 158).

Mulada said that "capping commissions would be saying I am not going to pay more than X amount." (Mulada 5). Mitchell agreed that there isn't any difference between capping total commissions versus cutting commissions on a single deal if only one was closed because "[a]t the end of the day, they get a limited amount of pay so that's the end of that." (Mitchell 71). Mount defined "uncap[ped]" as: "you could continue earning income on your plan as long as you keep bringing revenue in associated with the plan." (Mount 48).  Kingston said specifically that Beard's "pay was limited, capped, contrary to the written policy." (Kingston 194-95).

**F.     IBM admitted that Beard was reasonable in actually relying on the PowerPoint's promise not to cap.**

IBM's witnesses in this case testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representations in the PowerPoint that "earnings opportunities" and "payments" were "uncapped."  (Lipner 96; Johnson 118-19; Mulada 7; Mitchell 178; Mount 50). IBM's witnesses also agreed that it is true and reasonable to believe that "Seller earnings are … uncapped and the plan is paid based upon [sales] rather than an assessment of employee contribution." (Lipner 71-73; Johnson 118-19; Mulada 17; Mitchell 104; Mount 50, 103).

IBM's witnesses also agreed that if what IBM did with Beard's commissions was a "cap," that would violate IBM's policy. (Lipner 106-07; Johnson 119; Mulada 7; LaCivita 161; Nunez 9).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-06783-WHA

**G.      IBM admitted that the testimony in the Choplin Depositions remains true.**

IBM confirmed that all of the testimony in the Choplin Depositions attached to the Complaint here was true (Ex. 22), and IBM's 30(b)(6) witness confirmed in another case that his prior testimony about IBM's practices, policies, and procedures for commissions would "apply equally" to other salespeople (like Beard).  (Ex. 100, pp. 9-10, 13, 27-28).

**IV.      ARGUMENT AND CITATION TO AUTHORITY**

**A.      This Court's Prior Orders, and the Orders in *Swafford*, Are Directly On Point to the Non-Discrimination Claims.**

As an initial matter, it is remarkable that IBM ignores this Court's prior orders and the court's orders in *Swafford v. IBM*, No. 18-CV-04916-LHK (N.D. Cal.).  There are four such orders: (1) this Court's order denying IBM's motion to dismiss all claims (Dkt. No. 51); (2) this Court's order denying Beard's motion for judgment on the pleadings on the California Unfair Competition Law claim (Dkt. No. 75); (3) the order in *Swafford* denying IBM's motion to dismiss all claims (Exhibit A); and (4) the order in *Swafford* denying IBM's motion for summary judgment (Exhibit B).  Those orders make clear that, as a legal matter, the largely undisputed facts in this case (and certainly the facts in the light most favorable to Beard) require a jury.

**B.      The Fair Employment and Housing Act Claim Requires a Jury.**

**1.      Beard has established a prima facie case of race discrimination because two white salesman on his team were not capped when he was.**

IBM argues only the final of the four elements of a discrimination claim, conceding that Beard satisfies the first three. That is, IBM argues that Beard's claim fails because he is unable to show that others outside his protected class were treated more favorably. (Br. at 12).

Other employees are similarly situated to the plaintiff when they "have similar jobs and display similar conduct." *Earl v. Nielsen Media Research, Inc.*, 658 F. 3d 1108, 1116 (9th Cir. 2011).  The employees need not be identical, but must be similar in material respects. *Id*. Materiality depends on the context and is usually a question of fact that "cannot be mechanically resolved." *Id.* The Ninth Circuit has recognized that "it is 'important not to lose sight of the common-sense aspect" of the similarly situated inquiry.'" *Id.*

14

1    The bottom line is that IBM capped Beard, who is black, but not Donato and Beroza, who

2    were white and on the same team with Beard.  The commission plans for all were the same in their

3    being uncapped. (Exhibit C ¶ 5). These salesmen are paid for results, not simply for the work they

4    do; in fact, contribution towards a deal is not even a factor under these plans. (*Id.*).  Thus, what

5    really matters is simply that IBM capped Beard but not the other two men.  Despite this, IBM

6    argues that those two white sales employees were not similarly situated to Beard.  In truth, the

7    only difference between the men is that Beroza and Donato were not capped but Beard was.

8    Indeed, at the time that Mulada was making the unfounded decision to cap Beard's earnings,

9    Kingston brought this exact disparate treatment to light: that Donato and Beroza were paid the full

10   uncapped commissions, while Beard was the lone sales employee who had been capped in

11   Kingston's 18-year career at IBM, which to him raised the specter of racial discrimination.

12   (Kingston 167-68).

13   Furthermore, and contrary to IBM's argument, the HCL deals were *not* materially different

14   than Donato's and Beroza's deals.  Kingston, the supervisor of all three, has confirmed as much in

15   an affidavit, where he states that all three deals required "substantially similar work" and that, if

16   anything, the HCL deals were "the most complex and required more work from Mr. Beard than"

17   the other deals required of Donato and Beroza.  (Exhibit C ¶¶ 3, 12-13).

18   Moreover, even on the HCL deals at issue, Beard was treated disparately from his white

19   colleagues. IBM has presented shifting justifications for the capping of his commissions, but the

20   justification it provides now is that it essentially created an *ad hoc* rule for those deals that because

21   they were unique, contribution supposedly mattered. (*E.g.*, Br. at 14). However, Beard was the

22   only employee among 12 on the HCL deals whose commissions were adjusted in any way.

23   (Mulada 235-36).  Beroza and Donato are not the only comparators.

24   Although IBM initially claimed that Mitchell and Johnson were the decision-makers about

25   Beard's HCL commissions, discovery revealed that it was actually Mulada who made the

26   decision. Because Mulada did not have a role in the decision to pay Beroza or Donato, IBM

27   argues, Beard's claim fails. (Br. at 12). This argument misreads the law and the facts. The Ninth

28

15

1  Circuit "has not adopted the strict same supervisor requirement, and has noted that having a

2  different supervisor may be immaterial depending on the circumstances." *Belloni v. Roman*

3  *Catholic Archbishop of San Francisco*, 2015 WL 106587 (N.D. Cal. 2015). Here, the ESA team

4  was divided between two managers, Mount and Temidis. Mount was the first-line manager for

5  Beard, and Temidis was the first-line manager for Beroza and Donato. Kingston was the second-

6  line manager, and Mitchell the third-line manager, for all three sales employees. Under IBM's

7  policies, the line managers are the only ones with responsibility for approving or altering the

8  commissions payments to a sales employee. (Mulada 169). And here, the line managers approved

9  the commissions amounts for *all three* of these sales employees. (Exhibit C ¶¶ 7-9). However,

10 after these approvals, Mulada reached out and put his thumb on the scales and decided to limit

11 Beard's commissions, and no one else's, to what he thought was a fair amount. (Mulada 23-36).

12 He had never done anything like that before in his career, and Kingston had never seen anything

13 like this in his 18-year career with IBM. (Mulada 89-91; Kingston 32).  Neither Mulada, nor any

14 other similar manager at IBM, reached out and decided to cap Beroza or Donato like that.

15         **2.     IBM has not shown a legitimate, non-discriminatory reason for its**
                    **actions because its shifting justifications all violated IBM policy.**
16

17         IBM offers a supposed legitimate, non-discriminatory reason for its actions—that "the

18 HCL deals were unique."  (Br. at 14).  When an employer offers such a reason, "[a] plaintiff may

19 demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination

20 more likely than not motivated the employer; or (2) indirectly, by showing that the employer's

21 proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not

22 believable." "'Shifting reasons' are 'fundamentally different justifications for an employer's

23 action [that can] give rise to a genuine issue of fact with respect to pretext since they suggest the

24 possibility that neither of the official reasons was the true reason." *E.E.O.C. v. Timeless*

25 *Investments, Inc.*, 734 F. Supp. 2d 1035, 1063 (E.D. Cal. 2010) (quoting *Culver v. Qwest*

26 *Communs. Corp.*, 306 Fed. Appx. 403, 405 (9th Cir. 2009)).

27         IBM's proffered reason is disingenuous. First, the HCL deals were not unique in any

28 meaningful way—or if anything, they were *more* complex.  (Exhibit C ¶¶ 3, 12-13).  And even if

16

1  the deals were unique in some vague sense, that still would not be a proper basis to cap Beard

2  while paying every other employee who worked on the HCL deals in full.

3      Second, the supposed uniqueness was *not* the explanation originally provided to Beard's

4  second-line manager, Kingston.  Kingston was originally told that Beard's full commission was

5  just too much.  (Kingston 46-47).  Then he was told that Beard was capped because the Q3 deal

6  was under an NDA, but that made no sense to him because deals are often done under NDAs

7  without that fact impacting commissions. (Kingston 49). Then IBM simply said that the HCL

8  deals were "unique."  (Kingston 49). Now IBM supposedly relies on Beard's "contribution."  (Br.

9  at 8).  IBM's reasons shifted all over the place.  Kingston testified about this, stating that "there's

10  no question" that Beard was treated differently, and that none of IBM's offered reasons for that

11  different treatment made sense.  (Kingston 51-53).

12      **C.      The Equal Pay Claim Requires a Jury.**

13      Under the Equal Pay Act, Beard must only show that IBM paid non-African Americans

14  more for equal work; if he does, then IBM has the burden of showing that one of the exceptions

15  listed in the statute is applicable, which Beard may then may show is pretextual. *Green v. Par*

16  *Pools, Inc.*, 111 Cal. App. 4th 620, 624 (2003). To show a prima facie case, the plaintiff is not

17  required to prove intentional discrimination, just that the employer pays unequal wages for equal

18  work, as defined in the Act. *Id.* (citations omitted).

19      As noted above, Beard was paid less than Donato and Beroza, who were similarly situated,

20  for work that was "substantially similar" to their work.  The three men had essentially the same

21  commission plans.  The deals that they worked on were not materially different, and IBM even

22  admitted that it "should have" capped Donato and Beroza—but it did not.  IBM did not originally

23  justify capping Beard because of supposed "contribution," so it's proffered legitimate reason is

24  pretext.  And even looking only at the HCL deals, Beard was the only person capped.[9]

---

25  [9] IBM mentions that Beard knew David Swafford and that Swafford was capped. (Br. at 17). First,

26  the fact that one white person was also capped is not enough to avoid a jury on the discrimination
    claim. Second, Beard was on the same team as Donato and Beroza and shared two managers with

27  them; Swafford was on another team, so he is not "similarly situated" like they were.  Third,
    Swafford was capped by his third-line manager during the standard review process.  *See Swafford*

28  (footnote continued)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

**D.      The Fraud Claim Requires a Jury.**

**1.      The representation that IBM did not and would not "cap" was false.**

IBM claims that reducing commissions on a specific deal—or apparently even on all of a sales employee's deals but on an individual basis—as opposed to reducing the total amount of commissions due on all deals, is not a "cap" because the sales employee could theoretically make more commissions on another sale. (Br. at 17-18). That argument fails because the evidence is not only sufficient to go to a jury, it is overwhelmingly in Beard's favor.

First, the PowerPoint terms that are being construed—"payments uncapped" and "earnings opportunity uncapped"—are, at the *very least*, ambiguous on their face about that issue. Nowhere did IBM define the term "cap," either orally or in writing, and it can't argue a legal definition now. IBM has even admitted that "reasonable minds can differ about how they use or understand the term 'cap'" (Ex. 100, p. 78).

Second, the difference between capping all transactions or capping fewer than all is entirely semantic, especially where a sales employee—like Beard—closes only a handful of deals in a period, and the large deals comprise the majority of the sales. Under IBM's logic, it could accomplish its desired goal of reducing pay, in any amount and down to the penny, simply by reducing the commission for each and every deal—and supposedly that would not be a "cap"— while reducing the total amount would be a "cap," for reasons known only to IBM.[10]

Third, even IBM's own witnesses testified in this case that what happened to Beard was a "cap." (*E.g.*, Kingston 74, 194-95; Mount 158; *see also* Nunez 9 (agreeing that "cap [is] synonymous with limit")).

---

*v. IBM*, No. 5:18-cv-04916-LHK, Dkt. No. 83 at 8-11 (opposition to IBM motion for summary judgment).   Beard, by contrast, was capped totally outside of normal procedure, with no procedures or guidelines, by a person who had never capped before, and for shifting reasons.

[10] IBM contends that it can use the specific transactions review process to do virtually anything with commissions,  and it testified that—as long as there is a rationale for it—even implementing a ceiling on all commissions in a sales period is "not a cap." (Ex. 100, pp. 70-71).

18

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

Fourth, and by no means least, IBM witnesses in this case called the reduction of Beard's commissions a "cap" multiple times in contemporaneous internal emails (just like several internal emails in *Swafford* that used that exact word). (Exs. 29, 30, 45, 46).

IBM  claims that it did not "cap" Beard because it applied and satisfied the Specific Transactions Provision when reducing his commission. (Br. at 17-18). As an initial matter, whether that provision applies and was satisfied does not answer the question of whether IBM "capped"—there is no obvious or necessary link between those terms, and IBM "capped" Beard regardless of whether it applied that provision.[11]   In any event, the great weight of the evidence shows that it did not apply or satisfy that provision.

First, the Specific Transactions Provision *does not apply at all* to IQPs like Beard's plan. The provision itself reads as follows:

> Review of a Specific Transaction: If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

(Ex. 6). Lipner admitted that Beard's quota was correct (Lipner 162), and the deals were a long time coming, so the "opportunity anticipated" was not the basis for the cap.  Instead, IBM tries to rely on the "contribution" prong.  But the PowerPoint itself states explicitly that "contribution" is irrelevant to IQPs, where it states for IQPs (one of six types of plans listed): "Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of employee contribution." (Ex. 5 p. 8). Based on that language, Kingston testified that contribution is irrelevant to IQPs, although it is relevant for other types of plans, like pool plans,

---

[11] At several points in its brief, IBM claims that the PowerPoint promised no cap on "overall" commissions or earnings.  (Br. at 5, 18, 20). Of course, the PowerPoint does not use the word "overall" or anything like it; rather, it states, regarding commissions, "payments uncapped" and "earning opportunity uncapped." (Ex. 5).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

1   and so that provision of the generic IPL does not apply to Beard. (Kingston 64-69). Mount

2   agreed that contribution is simply not a factor for IQPs. (Mount 99-103).

3          Second, IBM did not apply the Specific Transactions Provision here because Johnson

4   straight-up admitted that it was not the basis for IBM's decision to reduce Beard's commissions in

5   this case. (Johnson 73-74). IBM can try to explain away that testimony at trial.

6          Third, the evidence is clear that IBM reduced Beard's commissions simply in order to save

7   money (by targeting the African-American) because he greatly exceeded his quota, not based on

8   the terms of this provision. Indeed, IBM's witnesses admitted that, although they sometimes cited

9   "contribution" as a basis for capping Beard, they never performed any actual analysis of his

10  "contribution." (Johnson 65-66, 232-50). Lipner admitted that capping based on Beard's

11  "contribution" was no different than simply "believing that [Beard's] payment was too high."

12  (Lipner 184). (Ex. 28). And in deciding how much to cap Beard, Mulada—a finance person—was

13  laser focused only on what the final number would be. (Johnson 180-81; Ex. 19).

14         Fourth, it's worth emphasizing that Beard's quota was correct. (Lipner 162). This wasn't a

15  situation where the employee is trying to take advantage of a quota-setting mistake; it's IBM

16  trying to take advantage of an employee working hard in reliance on a promise.

17         Fifth, the Specific Transaction Provision is irrelevant because when Beard's commissions

18  were capped, he'd already "earned" them under the terms of the IPL. (Ex. 17; Lipner 151-52).

19         **2.      Beard reasonably relied on the "no capping" representation.**

20         Whether a party's reliance is reasonable is ordinarily an issue of fact for the jury. *See, e.g.,*

21  *In re Lansford*, 822 F.2d 902, 904 (9th Cir. 1987).

22         As noted above, each of IBM's witnesses in this case testified that IBM does not lie and

23  that Beard was reasonable in relying on the PowerPoint's promise that IBM would not cap.

24  (Lipner 96; Johnson 118-19; Mulada 7; Mitchell 178; Mount 50). IBM has also agreed that it's

25  reasonable for sales employees to assume that the IPL is consistent with the PowerPoint

26  presentations and that they shouldn't have to read them looking for conflicts. (Ex. 100, pp. 73-74).

27  IBM's witnesses have testified that if what it did to Beard was a "cap," that would violate IBM's

28

                                                    20

1    policy. (Lipner 106-07; Johnson 119; Mulada 7).  In short, IBM's position in this case is really

2    that it *did not cap*, not that it *could cap*.

3         IBM's admission is compelled by the facts and by simple logic. For example, even if the

4    terms of the IPL were the key factor when it comes to whether reliance on the PowerPoint was

5    reasonable, the course of dealing and performance under the IPL still matters. After all, even if the

6    IPL were an enforceable contract—which it is not—the IPL's provisions, including those about

7    IBM's ability to alter commissions, could be waived or modified by the course of dealing and

8    performance for purposes of contract law. *See, e.g., Wind Dancer Prod. Grp. v. Walt Disney*

9    *Pictures*, 10 Cal. App. 5th 56, 78, (2017) (noting California's expansive law on modification and

10   waiver).

11        In its brief, IBM goes out of its way to tie the PowerPoint and the IPL together. (Br. at 19).

12   This is somewhat ironic, because Beard has always done the same thing—because doing so helps

13   his case. The fact that the two inconsistent statements at issue were contained in the same "Plan"

14   only makes it more likely and reasonable for an employee not to understand that one is somehow

15   automatically, and for unclear reasons, privileged over the other one.

16        Indeed, given that the IPL is undisputedly not a contract but a set of representations, why

17   should the IPL "override" the PowerPoint instead of the other way around? Why is the IPL

18   privileged over the PowerPoint, instead of the other way around? Particularly when IBM states

19   that the PowerPoint is the "primary" document to explain the entire compensation plan to its

20   employees. (Ex. 5).

21        IBM also relies on the Specific Transactions Provision.[12] As an initial matter, whether that

22   provision applies and was complied with is irrelevant to whether reliance was reasonable,

23   particularly given IBM's admissions. Or, *at the very least*, that provision is ambiguous enough that

24   even if it did apply and were complied with, that fact would not render reliance unreasonable as a

25   matter of law; in other words, that provision can apply while a sales employee like Beard still can

26

27   _____
     [12] In fact, the section of IBM's brief on reasonable reliance seems to rely entirely on the Specific
     Transactions Provision. (Br. at 18-20).

28
                                           21

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                          Case No. 3:18-cv-06783-WHA

1   reasonably rely on the representation that IBM will not cap. However, even if reasonableness of

2   reliance hinged on whether that provision applied, that provision either (a) did not apply as a

3   matter of law, or (b) at the very least there is a dispute about that, as explained above.

4        IBM also argues that even if Beard reasonably relied in Q3, he could not reasonably rely in

5   Q4 because he had been capped in Q3. (Br. at 19). That's wrong for several reasons: (1) IBM

6   claimed that it imposed the Q3 cap because that deal was unique because it involved an NDA, but

7   the Q4 deal did not involve an NDA (Ex. 55 p. 10); (2) IBM claims that there is an unwritten

8   review process that applies uniquely to each situation (Lipner 120, 190, 192; Johnson 70), and

9   there was *no* such process in Q4 (Ex. 84; Johnson 232-50); and (3) Nunez stated after the Q3 cap

10  that "we need to tell [Beard]" about a Q4 cap, so that it "didn't come as a surprise" even after the

11  Q3 cap, but IBM refused, noting that "setting a predefined cap is not consistent with the design

12  and terms within our plan."  (Exs. 30, 36, 55 p.10; Nunez 95-98).

13       **E.      The Negligent Misrepresentation Claim Requires a Jury.**

14       IBM relies on the same arguments here as it does in connection with fraud, including

15  reasonable reliance. For the reasons outlined above, IBM's arguments fail.

16       **F.      The Unjust Enrichment Claim Requires a Jury.**

17       IBM properly notes that "unjust enrichment is not available when a contract exists

18  governing all the claimed rights and responsibilities of the parties."  (Br. at 20-21).  IBM then

19  claims that "while the IPL did not create any obligations requiring IBM to pay Plaintiff more

20  commissions than he was already paid, the IPL was a document which spelled out the parties'

21  respective rights and responsibilities with respect to the payment of commissions."  (Br. at 20-21).

22       IBM has successfully argued for years, in order to defeat claims for breach of the IPL, that

23  the IPL is not a contract *at all* and does not create *any contractual obligations*, citing the IPL's

24  language.  Dkt. No. 65 at 7-8 & n.5.  That was the basis for Beard's motion for judgment on

25  pleadings in this case, where he argued that he must prevail on his claim under California Labor

26  Code § 2751 because the IPL is not a contract.  All of this is discussed in more detail below in

27  connection with the § 2751 claim, but the principle applies here too: if the IPL is not undisputedly

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT              Case No. 3:18-cv-06783-WHA

1   a contract, and it is not, then the IPL cannot bar the unjust enrichment claim.  Notably: (a) the

2   Court in *Swafford* rejected this argument against unjust enrichment, noting that "IBM admits that

3   the IPL did not create a contract and that the 'IPL did not create any contractual obligations'"

4   (Exhibit B at 18 (quoting IBM's motion)); and (b) IBM made the same argument in its motion to

5   dismiss here, using the exact same language as it did in *Swafford*, and this Court denied the motion

6   (without explicitly mentioning that argument),[13] Dkt. No. 30 at 12, 17, 18; Dkt. 51 at 10.

7        IBM also argues that "because IBM retained sole discretion to determine how much to pay

8   Plaintiff in commissions, Plaintiff cannot credibly argue that it was 'unfair' or 'unjust' for IBM to

9   pay him less than what he wanted."  (Br. at 21).  However, as noted above, IBM did not have "sole

10  discretion" to pay Beard whatever it wanted, *because IBM promised Beard that it would not cap*

11  *him*.  Beard is not suing because he was paid less than he "wanted;" he is suing because he was

12  paid less than he was *promised*.  It is IBM that is trying to do simply what it "wants" to do.

13       Finally, it's worth reemphasizing that IBM has admitted that it had an "obligation" not to

14  cap, and that it could not and would not cap. (Lipner 95-97; Johnson 117; Mulada 17; Nunez 10;

15  LaCivita 161; Copeland 255). What is unjust enrichment but an "obligation" to pay for something

16  where there is no contract to pay for the thing?

17       **G.      The Unfair Competition Claim Requires a Jury.**

18       Section 17200 of the California Business & Professions Code (the "UCL") creates a cause

19  of action for business practices that are: (1) unlawful, (2) unfair, or (3) fraudulent. Each "prong" of

20  the UCL provides a separate and distinct theory of liability. *Lozano v. AT & T Wireless Servs.,*

21  *Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

22                **1.      The unfair and fraudulent prongs require a jury.**

23       IBM argues that the UCL claim based on fraud and unfairness fails only because IBM is

24  entitled to summary judgment on the claims for misrepresentation and unjust enrichment. (Br. at

25  ───────────────
    [13] The two cases that IBM cites—*O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL
26  6354534 (N.D. Cal. Dec. 5, 2013), and *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*,
    No. 5:12-CV-06209-EJD, 2013 WL 3974537 (N.D. Cal. July 31, 2013)—involved documents that
27  undisputedly were contracts, which therefore precluded unjust enrichment.

28
───────────────

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-06783-WHA

21-22). Because IBM is not entitled to summary judgment on those claims, for the reasons stated above, it is not entitled to summary judgment on the UCL claim based on fraud and unfairness.

### 2.    The unlawful prong requires a jury.

IBM properly notes that the UCL can "borrow" any violation of state or federal law to satisfy the unlawful prong.  (Br. at 22).  IBM then argues that it prevails on all of the violations of law alleged by Beard. IBM is wrong: there is sufficient evidence that IBM violated Sections 221 and 223, and 2751 of the California Labor Code.[14]

Section 221 makes its unlawful for an employer "to collect and receive from an employee any part of wages theretofore paid by said employer to said employee."  The evidence shows that IBM violated this statute by promising not to cap Beard's commissions and then capping them.  In response, IBM cites *Kemp v. Int'l Bus. Machines Corp.*, No. C-09-4683 MHP, 2010 WL 4698490, (N.D. Cal. Nov. 8, 2010).  As this Court noted in ruling on the motion to dismiss, *Kemp* is easily distinguishable because it did not involve the PowerPoint or any other promise of "no capping."  Dkt. No. 51 at 6 n.2.  Like many other cases, it involved merely the IPL.

Furthermore, IBM's argument here directly contradicts the argument that it makes below regarding Section 2751.  Here, IBM argues that you cannot succeed under Section 221 without a contract, and that the IPL is not a contract.  Indeed, *Kemp* held exactly that, citing all of the older cases where IBM succeeded on that argument.  *Id.* at *5.  But when it comes to Section 2751, of course, IBM argues that the IPL *is* an enforceable contract.  It cannot have it both ways.

Section 223 provides that "[w]here any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designed by statute or by contract."  In response, IBM claims that there is nothing "secret" about what it agreed to pay under the IPL, and that the IPL does not "designate" any wage that IBM failed to pay "or otherwise create any contractual obligation by IBM to pay additional commissions."  (Br. at 23).  Again, IBM simply glosses over the key fact of this case—IBM's

---

[14] Beard does not oppose IBM's motion regarding violations of Sections 200, 201, 202, and 204 of the Labor Code and violations of Industrial Welfare Commission Wage Orders.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

1    written promise in the PowerPoint that it would not "cap" Beard.  Also, the unique and

2    undisclosed review process used here was the very definition of "secret."  Furthermore, IBM

3    argues against the Section 2751 claim that the IPL *is* an enforceable contract; if it is, then IBM

4    violated Section 223.  IBM cannot have it both ways.

5        Finally, Section 2751 provides: "Whenever an employer enters into a contract of

6    employment with an employee for services to be rendered within this state and the contemplated

7    method of payment of the employee involves commissions, the contract shall be in writing and

8    shall set forth the method by which the commissions shall be computed and paid."  *See Piccarreto*

9    *v. Presstek, LLC*, 2017 U.S. Dist. LEXIS 137255 (C.D. Cal. August 24, 2017) (applying the

10   statute). The purpose of Section 2751 is to protect employees who are paid commissions, and who

11   are thus vulnerable to the types of manipulations, delay, and obfuscations regarding compensation

12   that Beard challenges in this case. *See Lett v. Paymentech, Inc.*, 81 F. Supp.2d 992, 994 (N.D. Cal.

13   1999) (the statute was designed to protect employees from "being cheated out of commissions.").

14       IBM has violated this statute because the IPL is not a contract, as the very document itself

15   states. (Ex. 6). Consistent with that language, IBM argued throughout its motion to dismiss in this

16   case—as it has in every other case involving the IPL for over 15 years—that the IPL is *not* a

17   contract.  *E.g.*, Dkt. No. 30 at 12 ("[Beard's] incentive plan did not create a contractual obligation

18   or promise by IBM to pay commission…").  IBM's one witness who was an attorney testified

19   that, based on the IPL's language, it is not a contract.  (Suh 116).

20       IBM now argues that the IPL satisfies Section 2751, even though it is not a contract,

21   because it is in writing, it (supposedly) explains how Beard's commissions are paid, and Beard

22   understood it and signed. (Br. at 24-25). That is all beside the actual point—which is that the IPL

23   is not an enforceable contract. IBM also argues that Beard was not "harmed" by a violation of

24   Section 2751, which is absurd: he was harmed because, had IBM complied with Section 2751, he

25   would have had an enforceable contract claim for breach of the IPL.  (Br. at 25).  Had IBM

26   actually bound itself with an enforceable contract—maybe with something like the IPL, but

27   without all of the provisions stating that it's not a contract and provides no rights to any

28

                                        25

commissions—Beard could have sued under that. Section 2751 was designed to prevent exactly what happened in this case.

IBM cannot have it both ways. Either the IPL is a contract that complies with the requirements of Section 2751 and therefore IBM is contractually obligated to pay uncapped commissions, or the IPL is not such a contract and IBM is in violation of this statute. Beard did not allege a claim for breach of the IPL for the very reason that he agrees with IBM that the IPL, based on its own terms, is not an enforceable contract—hence his other claims, like the fraud claim, and this claim for violation of Section 2751. The simple truth is that IBM has gotten away with its "no-obligation-IPL" for a long time in many states, but it has never had to face Section 2751 before.  IBM is in a Catch-22 of its own making.

Furthermore, Section 2751 requires that the written commissions contract be signed by the employer. Cal. Labor Code § 2751; *see also Piccarreto,* 2017 U.S. Dist. LEXIS, at *5 ("In failing to provide Piccarreto with a 'signed' copy of the 2015 Compensation Plan, which is a commission agreement, Presstek violated the express terms of Section 2751(b)"). Here, it is undisputed that Beard's IPL was not signed by IBM. IBM completely ignores that fact in its brief, despite Beard having raised the issue at the motion to dismiss stage.[15]

As noted above, this Court denied Beard's motion for judgment on the pleadings on the Section 2751 claim on the grounds that there is a fact dispute about whether the IPL is a contract. Beard is happy to try that issue to a jury, but he respectfully believes that the evidence is undisputed that the IPL is *not* a contract, as the court in *Swafford* held.  Furthermore, he plans to seek a pre-trial ruling that IBM should be judicially estopped from asserting as a fact something that it has claimed in this very case, and in other cases for years, is not a fact.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) (describing the doctrine).

V.    **CONCLUSION**

IBM's motion should be denied in its entirety.

---

[15] IBM does assert that the IPL was "acknowledged" by IBM HR, apparently referring to the stamp on the IPL stating "HR Approved." (Br. at 24). That is not a signature.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA

Dated: March 12, 2020

BY:   /s/ Matthew E. Lee
      Matthew E. Lee (*pro hac vice*)
      Jeremy R. Williams (*pro hac vice*)
      **WHITFIELD BRYSON &
      MASON, LLP**
      900 W. Morgan Street
      Raleigh, NC 27603
      Telephone: (919) 600-5000
      Facsimile: (919) 600-5035
      matt@wbmllp.com
      jeremy@wbmllp.com


      /s/ Mark R. Sigmon
      Mark R. Sigmon (*pro hac vice*)
      **SIGMON LAW, PLLC**
      5 W. Hargett St., Suite 1001
      Raleigh, NC 27601
      Telephone: (919) 451-6311
      Fax: (919) 882-9057
      mark@sigmonlawfirm.com


      Seth Alan Rafkin
      Jennifer Bogue
      **RAFKIN ESQ., PLLC**
      1201 Sussex Turnpike, Suite 102
      Randolph, NJ 07869
      srafkin@rafkinesq.com
      jbogue@rafkinesq.com

      *Attorneys for Plaintiff*

27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ) | Case Number: 3:18-cv-06783-WHA |
| JEROME BEARD, ) | |
| ) | **CERTIFICATE OF SERVICE** |
| Plaintiff, ) | |
| ) | |
| v. ) | Complaint Filed: November 8, 2018 |
| ) | Trial Date: June 1, 2020 |
| ) | |
| INTERNATIONAL BUSINESS ) | |
| MACHINES CORPORATION, ) | |
| ) | |
| Defendant. ) | |

This is to certify that on March 12, 2020, the foregoing was served filed with the Clerk via ECF which will notify all counsel of record as to same via NEF.

/s/ Matthew E. Lee
Matthew E. Lee
N.C. State Bar No. 35405
Jeremy R. Williams
N.C. State Bar No. 48162
**Whitfield Bryson & Mason LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:     919-600-5000
Facsimile:     919-600-5035
matt@wbmllp.com
jeremy@wbmllp.com

*Attorneys for Plaintiff*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    Case No. 3:18-cv-06783-WHA