1
2
3
4
5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEROME BEARD,

        Plaintiff,

    v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Defendant.

No.  C 18-06783 WHA

**GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this employment action arising out of a dispute over commission payments, defendant moves for summary judgment.  For the reasons stated herein, defendant's motion is **GRANTED IN PART AND DENIED IN PART.**

## STATEMENT

This employment case is a dispute over commissions, not over termination or failure to promote.  Plaintiff Jerome Beard is an African-American who began working as a software sales representative for defendant International Business Machines Corp. in 1983.  Throughout his career with IBM, Beard has received numerous accolades for his work, including "The Best of IBM."  Starting in 2008, Beard started selling IBM software through a contract vehicle called Embedded Solutions Agreements ("ESA") which enabled a buyer to embed the software

into its own products. In his role as a ESA sales representative, Beard received a base salary plus commissions (Beard Dep. 26–29, 31; Exh. 101).

For the second half of 2017, Beard had a written commission plan known as the Incentive Plan Letter ("IPL") which covered the sales period between July 1, 2017 and December 31, 2017. The IPL set Beard's target sales quota for the second half of 2017 at $934,746. The IPL also provided information about his commissions (Beard Dep. 41–42, Exh. 6).

The IPL provided that an employee would not be eligible to receive incentive payments without an IPL in place and, that "[b]y accepting this Incentive Plan Letter you acknowledge that you have read and understood the terms of the Plan" (Dkt. No. 78-1, Exh. 6).

The IPL also contained several other disclosures which Beard read when he received his IPL in July 2017. Those relevant to the instant action are provided below (*ibid.*) (emphasis added):

> **Right to Modify or Cancel**: *The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it*. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing your accepted Incentive Plan Letter if your incentive eligibility status changes.
>
>        \*       \*       \*
>
> **Review of a Specific Transaction**: if a specific customer transaction had a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

Additionally, the IPL contained a link to IBM's Worldwide Incentives Workplace. The IPL stated that the "Incentive Plan information contained at this website is referred to here in your [IPL] as the 'Plan'" (*ibid.*). That link contained various materials, significant among them: a PowerPoint presentation titled "Your 2017 Incentive Plan, individual quota plan (IQP)" which described the terms of Beard's commission plan. The presentation stated that it "is the primary 2017 education for IBM sales employees and managers. It covers the

information you will need to understand your 2017 plan."  Indeed, the PowerPoint contained specific information about Beard's commissions such as pay accelerators and a minimum performance threshold which were not included in the IPL (Dkt. No. 78-1, Exh. 5).

Despite the IPL disclaimers, IBM made repeated representations in its PowerPoint presentations that Beard's commissions would be "uncapped."  Specifically, the PowerPoint presentation stated that "[s]eller earnings for these plans are uncapped and the plan is based on achievement results rather than on assessment of employee contribution."  In all, various slides in the PowerPoint made representations that "payments" and/or "earning opportunit[ities]" were "uncapped" (*id*. at 11, 14).  The PowerPoint did not make any references to any of the disclaimers in the IPL.

In order to incentivize sales representative to sell as much as they can, IBM did not cap commissions (Suh Dep. 116–117).  Beard testified that he read the uncapped statement in the PowerPoint and understood it to mean that IBM would not place an artificial limit on what he could earn.  Indeed, IBM had never before reduced Beard's commissions prior to the events that precipitated this action (Beard Dep. 31–32, 80, 84, 107–108).

This action arises out of two large deals Beard helped IBM close with HCL America Inc. in the second half of 2017; one in the third quarter ("3Q HCL deal") and another in the fourth quarter ("4Q HCL deal").  IBM reduced Beard's commission on both deals.  During both deals, Greg Mount, Scott Kingston, and Dave Mitchel were Beard's first, second, and third-line managers, respectively (*id*. at 32–33).

### 1.    3Q HCL Deal

In 2017, IBM decided to sell some of its intellectual property.  Accordingly, it sent notice to some potential buyers, including HCL America Inc., inviting bids.  Sometime after that, Inhi Suh, General Manager of IBM's Watson Working and Collaboration, pitched an IP Partnership ("IPP") deal to HCL for the sale of IBM intellectual property within her and Brian Mulada's portfolios.  Mulada was the VP, CFO, and COO of IBM's Cognitive Solutions Group.  During that meeting, Suh suggested adding an ESA component to the deal.  The next day, HCL

1  decided it wanted to close the part IPP and part ESA deal that Suh had proposed, so she

2  quickly assembled a team to go close the deal in Boston (Suh. Dep. 62–63, 65–68).

3      Thereafter, Beard became involved in the deal and flew to Boston to help negotiate and

4  structure the ESA portion of the deal.  Given that the deal remained confidential, Beard had to

5  sign a non-disclosure-agreement.  Beard worked near 24-hour days for two weeks to close the

6  deal, which he did on September 30, 2017, for approximately $100 million — $80 million for

7  the IPP portion and $20 million for the ESA portion of the deal (Mulada Dep. 121, 166–167;

8  Dkt. No. 81-2, Exh. 37).

9      The ESA part of the 3Q HCL deal generated $12.6 million in commissionable revenue.

10  This meant that Beard had dramatically exceeded his $934,746 sales quota for the second half

11  of 2017.  Applying the relevant pay accelerator from the PowerPoint, Beard's October

12  commission statement showed that his commission on the deal amounted to $1,464,417.

13  Because Beard's achievement on the 3Q HCL deal exceeded his sales quota, however, it

14  triggered a standard out-of-range review process (Dkt. No. 81-7, Exh. 17; Johnson Dep. 137).

15      As part of the standard review process, IBM's incentives team emailed Beard's line

16  managers for approval of his achievement on the 3Q HCL deal.  By October 19, 2017, all three

17  of Beard's line managers had signed off on the full amount.  At that point, Maria Lipner, VP of

18  defendant's Global Sales Incentives, testified that the standard review process had completed

19  and that but for Mulada's intervention, Beard would have received the full commission amount

20  of approximately $1.46 million (Lipner Dep. at 163).  Instead, on October 20, Karla Johnson,

21  Director of North America and Latin America Sales Commissions, informed Beard that the 3Q

22  HCL deal had become subject to an additional review and that his commission would be held

23  pending its completion.

24      Ultimately, IBM reduced the commissionable revenue to Beard from $12.6 million to

25  two million dollars, which had the effect of reducing Beard's commission from $1,464,417 to

26  $232,458.  IBM explains that it reduced Beard's commission because this deal seemed

27  "unique" as both a large deal — part IPP and part ESA — and as one constructed by IBM

28  senior executives, not Beard.  IBM claims that its action was justified and proper pursuant to

4

the "review of a specific transaction" disclaimer in the IPL, which it says gave it the right to adjust Beard's commissions on specific deals and base it on his contribution, notwithstanding the PowerPoint presentation's representation that "employee contribution" was not a factor.

It is undisputed that Mulada led the charge to reduce Beard's commissions (Mulada Dep. 217). He provoked the additional review and ultimately, the reduction. Here are the details.

On October 7, 2017, Mulada emailed Lipner stating that (Dkt. No. 81-6, Exh. 16):

> [c]an you please confirm that the HCL ESA is either carved out or not impacting our seller commissions? This deal was closed directly by Inhi/Sean Flynn/Jerome Beard. I can call you and give you the details/background. It was a large deal done at top and I want to make sure not flowing [business as usual].

Lipner responded the same day stating that "[s]ellers benefit from the blue birds" and that "[c]ontribution is not part of the process." Lipner testified that she meant that sellers benefit from "unusual transactions" and their contribution to a deal is generally not a factor. Rather, the commissionable revenue which flowed from a sale determined a sales representative's commission payment. Lipner nonetheless said she would look into the facts and provide options. The next day, Mulada responded that the 3Q HCL deal was an "outlier," that it "generated from [IBM] senior leadership team[,]" and re-iterated that the deal was "exclusively" closed by Beard, Flynn, and Suh (*ibid.*; Lipner Dep. 73, 141).

In a November 8 email to Mulada, Lipner stated that she considered the 3Q HCL deal "a unique NDA deal" since only four people knew about the transaction. She stated, therefore, that the 3Q HCL deal warranted being carved out of the regular flow of commissions. Further, she pointed out for Mulada that out of the four employees who worked on the deal, only Beard and Marcy Pearson had commission plans. Lipner stated that Beard's line managers had already approved his commission payment of $1.46 million based on the $12.6 million in commissionable revenue generated by the 3Q HCL deal. Suh testified that Mulada became "upset" once he learned about how much Beard stood to make in commission (Dkt. No. 81-8, Exh. 18; Suh Dep. 158).

Mulada then emailed Lipner and Johnson asking them to crunch the numbers of what Beard's payout would be at 100%, 200%, 250%, and 300% of his sales quota. Johnson replied

with the numbers crunched and said that achievement "needs to be tied to the effort that Jerome spent. We have the most legal risk when the decision is made based on some expense level or dollar amount" (Dkt. No. 81-9, Exh. 20A). Mulada then asked Johnson to do the math on how much Beard's commission would be if the commissionable revenue went down to two million dollars.

Mulada also expressed his concern to Rose Nunez, IBM' Channels director, stating that "1.5m full payment is inappropriate and unacceptable given the nature of this transaction" (Dkt. No. 81-10, Exh. 21). Mulada stated that the 3Q HCL deal warranted different treatment because it had been identified, sold, and executed by senior leadership, and that he will flow appropriate achievement dollars to Beard for his contribution to the deal (Dkt. No. 81-13, Exh. 27). Nunez agreed with Mulada that Beard's commission appeared excessive.

On November 21, Nunez emailed Mulada and Johnson with her recommendation regarding Beard's commissions. She recommended that Beard be "capped" at between 200 and 250 percent of his sales quota. Johnson responded, informing Nunez that IBM did not cap commissions and that "setting a pre defined cap is not consistent with the design and terms within our plane [sic]" (Dkt. Nos. 81-16, 81-19, Exhs. 30, 36).

Eventually, Mulada decided that no commission be awarded to anybody who did not sign a NDA in connection with the 3Q HCL deal, which meant that only Beard and Pearson would receive commissions on the deal. Mulada then reduced the commissionable revenue to two million dollars only with respect to Beard, but not anyone else (Mulada Dep. 159–160, 164–165; Dkt. No. 81-14, Exh. 28). Mulada testified that in deciding to flow only two million in commissionable revenue to Beard, he discussed Beard's contribution on the deal with Suh, and considered prior ESA activity and the ESA pipeline in order to ensure that Beard received a reasonable payment for his efforts (Mulada Dep. 171–172, 174).

This reduced his commission to $232,458. Even after the reduction, Beard remained the highest paid individual on this deal. Pearson received $21,898 (IBM's Second Supplemental Interrogatory Resp. at 9).

### 2.    4Q HCL DEAL

Beard also helped close another deal with HCL in the fourth quarter of 2017 worth $100 million.  The ESA part of the deal ranked at $15 million, which again generated around $12 million in commissionable revenue.  Unlike the 3Q HCL deal, it had no NDA for anyone.  It closed on December 30, 2017 (Beard Dep. 58–61).

Nunez, who had expressed concern that Beard's commission on the 3Q HCL deal had been adjusted after the fact, personally apprised the sales team that the 4Q HCL deal would be treated the same as the 3Q deal — flowing two million as commissionable revenue instead of $12 million — before the 4Q deal closed in order to ensure that it did not come as a surprise to them (Nunez Dep. 98; Dkt. No. 81-19, Exh. 36).  Accordingly, prior to the 4Q HCL deal closing, but after Beard had already began working on it, Mount, Beard's first line manager, told him that his commission on the 4Q deal would be reduced (*id.* at 156).

Mulada testified that he made the decision to treat Beard's commission with respect to the 4Q HCL deal in the same manner as the 3Q HCL deal (Mulada Dep. 217).  IBM explains that it also considered this deal unique because it had been bundled with a purchase commitment — in other words, it was not a purely ESA deal.

Ultimately, IBM paid Beard $324,441 in commission for the 4Q HCL deal rather than the approximately $1.5 million which would have resulted if defendant had flowed the full $12 million.  Again, even after the reduction, Beard remained the highest paid commissioned employee with respect to the 4Q HCL deal (IBM's Second Supplemental Interrogatory Resp. at 9).

### 3.    IBM'S OPEN DOOR INVESTIGATION

Following these reductions, Beard filed an internal complaint alleging racial discrimination and violations of IBM's payment policies.  Beard alleged, as he does here, that two white sales representatives on the same ESA team, Nick Donato and Bill Beroza, were treated more favorably because IBM had not adjusted their commissions on similar deals in 2017.  Donato and Beroza had the same second and third line managers as Beard.  Like him,

United States District Court
Northern District of California

their commissions also triggered a standard out-of-range review, which their line managers also approved.  Unlike Beard, however, Donato and Beroza were paid in full.

Specifically, Donato received $1.6 million dollars in commission for a deal he closed with SAS, and Beroza received $738,000 for a deal he closed with Deloitte (Kingston Decl. ¶¶ 7–8).  Mulada had no involvement in these deals, which remained pure ESA deals, far less complex than the HCL deals.  According to Kingston, Beard's second-line manager, this alleged disparate treatment coupled with different explanations he received as to why Beard's commissions had been reduced, raised the "specter of race" (Kingston Dep. 194).  Moreover, Beard testified that he is good friends with Beroza and when he told Beroza about his commissions being reduced, Beroza "joked" that it was probably because plaintiff is "black" (Beard Dep. 133–134).

Beard testified that he knew that IBM had to grant an exception for Beroza to get paid on the Deloitte deal.  Beard testified that he'd encountered the same issue a couple of years prior, but IBM had granted Beard the same exception so that he could receive his commission (Beard Dep. 144–145).

The internal investigation report concluded that no wrongdoing had occurred.  Beard thereafter initiated this action.

### 4. PROCEDURAL HISTORY

Beard commenced this action in November 2018, asserting claims for (1) violations of California's Labor Code Sections 2751, 221, and 223, (2) violations of California's Unfair Competition Law, (3) race discrimination under California's Fair Housing and Employment Act, (4) unjust enrichment, (5) fraudulent misrepresentation, and (6) negligent representation.  An order dated April 7, 2019, granted in part and denied in part IBM's motion to dismiss (Dkt. No. 51).  Another order denied Beard's motion for judgment on the pleadings with respect to his UCL claim (Dkt. No. 75).  IBM now moves for summary judgment on all of Beard's remaining claims.

# DISCUSSION

## 1.    LEGAL STANDARD

Summary judgment is appropriate under FRCP 56 when there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  A district court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, whether or not there are any genuine issues of material fact.  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## 2.    FRAUD CLAIM

Beard brings a claim for fraudulent misrepresentation arguing that IBM capped his commission despite IBM's repeated representations that commissions were "uncapped."

To show fraud under California law, Beard must show: (1) a misrepresentation, (2) knowledge of falsity, (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).

IBM argues that summary judgment on Beard's fraud claim is required because he cannot show that it made false representations or that his reliance was reasonable.  Each argument is discussed below.

### A.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER OR NOT IBM MADE FALSE REPRESENTATIONS*

Beard's complaint alleges two categories of misrepresentations: (1) statements in the PowerPoints, and (2) statements by IBM managers.  A prior order dismissed Beard's fraud claims based on statements by IBM's managers for failure to comply with FRCP 9(b) (Dkt. No. 51).  This order thus focuses on IBM's statements in the 2017 PowerPoint presentation, which made repeated representations that "payments" and/or "earning opportunit[ies]" would be "uncapped" (Dkt. No. 78-1, Exh. 5).

According to IBM, these statements were not false because making "an adjustment to commissions on a specific deal" pursuant to the review of a specific transaction disclaimer in

the IPL did not constitute "a cap on a sales representative's *overall* ability to earn commissions" (Dkt. No. 78 at 18) (emphasis added). Even though Beard's commissions on individual transactions got reduced, he suffered no cap or limit on his ability to earn commissions on other deals. IBM thus argues that its representations of "uncapped" commissions squared with IBM's reductions of Beard's commission on the HCL deals. On this record, a jury could reasonably find otherwise.

Another court in this district recently considered and rejected the same argument made by IBM in a substantially similar action. *See Swafford v. Int'l Bus. Machs. Corp.*, 408 F.Supp.3d 1131, 1142–43. Judge Lucy Koh held that there remained a genuine issue of material fact with respect to the falsity of the statements contained in IBM's PowerPoint presentation because the meaning of those statements — "payments" and/or "earning oppurtuni[ties]" being "uncapped" — were disputed. *Id*. at 1143. So too here.

Here, as in *Swafford*, IBM's employees referred to the adjustment of Beard's commissions on the HCL deals directly as "caps." For instance, internal emails here show that Lipner, Johnson, and Nunez all referred to reducing the commissionable revenue from $12.6 million to two million as a "cap" (*See* Dkt. No. 78, Exhs. 7, 30, 45, 46).

Moreover, Kingston testified that Beard's "pay was limited, capped, contrary to the written policy" (Kingston Dep. 194:25–195:1). Mulada testified that "capping commission would be saying I am not going to pay more than X amount" (Mulada Dep. 5:14–16). Beard himself testified that he understood uncapped to mean IBM could not place an artificial limit on his earnings (Beard Dep. 84:18–25). Hence, there is conflicting evidence and questions of fact exists as to the meaning and falsity of the "uncapped" representations made in the PowerPoint presentation.

IBM's reply brief claims, without citing to the record, that Beard *"agrees that his commissions were not actually capped"* (Dkt. No. 86 at 9) (emphasis in original). IBM, however, misrepresents Beard's testimony. Indeed, contrary to IBM's contention, Beard testified that: "[t]he third quarter and fourth quarter deals were capped" (Beard Dep. 152:20–23).

In short, whether or not the review of a transaction disclaimer can be read consistently with the guarantees of uncapped payments in the PowerPoint presentation is a genuine issue of material fact for the jury to decide.

### B.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO THE REASONABLENESS OF BEARD'S RELIANCE

IBM next argues that Beard cannot show that he reasonably relied on the representations in the PowerPoint, particularly with respect to the 4Q HCL deal.  In support, IBM argues that (1) the review of a specific transaction disclaimer in the IPL — which Beard testified he read — informed him of the possibility that his commission could be reduced on certain deals, and (2) Beard knew before the closing of both HCL deals that his commissions would get *reviewed*, and with respect to the 4Q HCL deal even that it would be *adjusted*.

Under California law, whether or not reliance is reasonable is a question of fact except "in the rare case where the undisputed facts leave no room for a reasonable difference of opinion[.]"  *Blankenheim v. E.F. Hutton & Co.*, 217 Cal.App.3d 1463, 1475 (1990).

For the reasons stated below, this order holds that a reasonable difference of opinion exists as to whether or not Beard's reliance on IBM's allegedly misleading statements were reasonable notwithstanding the disclosures in the IPL.

*First*, the PowerPoint stated that it was the "primary" education for sales representatives to understand the terms of their compensation.  Indeed, it contained the specific details of Beard's commission payments, absent from the IPL.  Thus, a jury could find that Beard reasonably relied on assurances in the PowerPoint that payments would be uncapped notwithstanding the IPL.  Importantly, Beard testified that IBM had never before in his career reduced his commission despite having closed other large deals and having agreed to similar IPLs (Beard Dep. 31–32).  The disclaimers in the IPL, therefore, did not make Beard's reliance unreasonable, or so a jury could find.

*Second*, numerous of IBM's employees agreed that it would be reasonable for Beard to read "uncapped" in the PowerPoint and believe that representation to be true (*See* Lipner Dep. 97:6–13; Mount Dep. 51:11–14).

*Third*, IBM fails to explain how Beard's knowledge of a review process precludes justifiable reliance.  IBM points to Beard's testimony wherein he admitted that Mount had told him that his commission would get reviewed before the 3Q HCL deal closed.  He also testified, however, that he knew every aspect of the HCL deals would get reviewed, not just his commissions.  Moreover, the focus of the standard out-of-range review is for line managers to identify any issues with quotas, territories, or any errors related to the amount of an achievement.  As the approval of Beard's line managers evinced, no such issues existed.  IBM, therefore, fails to explain how knowledge of a standard out-of-range review process forecloses reliance.

*Fourth*, the fact that IBM informed Beard prior to the closing of the 4Q HCL deal that his sales achievement would be reduced to two million, similar to the 3Q HCL deal, does not preclude a finding of justifiable reliance.  This is because Beard had already began working on the 4Q HCL deal by the time IBM informed him.  Importantly, Beard testified that had he known that his commission on the 4Q HCL deal would be reduced from the start, he would have focused his efforts on other deals.  Therefore, a jury could find that he reasonably relied on the representations in the PowerPoint with respect to the 4Q HCL deal as well.

As held in a prior order, "[i]t will be a question of fact for the jury whether the reliance was reasonable" (Dkt. No. 51 at 6).   IBM's motion for summary judgment on Beard's fraud claim is therefore **DENIED**.

### 3.    NEGLIGENT MISREPRESENTATION

To prove a claim for negligent misrepresentation under California law, Beard must show "(1) a misrepresentation of material fact; (2) without reasonable grounds for believing it to be true; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Glen K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1200 n.2 (9th Cir. 2001).

IBM moves for summary judgment on Beard's negligent misrepresentation claim for the same reasons as the fraud claim.  Because this order already held that Beard had established genuine issues of material fact with respect to the falsity of the representations made in the

PowerPoint and as to the reasonableness of his reliance, this order **DENIES** IBM's motion for summary judgment on Beard's negligent misrepresentation claim.

### 4. UNJUST ENRICHMENT

Unjust enrichment is not a cause of action or even a remedy "but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution." *McBride v. Boughton*, 123 Cal.App.4th 379, 387 (2004) (quotation marks omitted). As such, a claim for unjust enrichment is properly pled as a claim for a contract implied-in-law. It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996).

IBM argues that it is entitled to summary judgment because Beard "agreed to a *document* (the IPL) which expressly gave IBM the right to review and adjust his commissions at its sole discretion, the terms of which foreclose his unjust enrichment claim" (Dkt. 71 at 21) (emphasis added). Significantly, however, IBM does not claim that the IPL is an enforceable binding contract. Though its brief flirts with contract vernacular, it deliberately avoids claiming that it is a contract between Beard and IBM. As will be discussed in more detail below, this order determines that the IPL, according to its own terms, is not a contract. In the absence of a binding enforceable contract, therefore, Beard can maintain a claim for unjust enrichment.

Moreover, IBM's citation to *O'Connor v. Uber Techs., Inc.*, 2013 WL 6354534, (N.D. Cal. Dec. 5, 2013) (Judge Edward M. Chen), and *Integrated Storage Consulting Servs. v. NetApp, Inc.*, 2013 WL 3974537, (N.D. Cal. July 31, 2013) (Judge Edward J. Davila), are inapposite. Unlike the instant action, both decisions involved binding contracts.

Next, IBM argues that Beard cannot show that its decision to reduce his commissions constituted "unfair" or "unjust" because IBM retained sole discretion in the IPL as to how much it would pay Beard in commissions. As discussed above, however, since Beard has established a genuine issue of material fact as to whether or not IBM committed fraud, he has thereby also established a genuine issue of material fact as to whether or not it unjustly enriched itself by significantly reducing Beard's commission on the HCL deals. This is especially true with respect to the 3Q HCL deal because IBM adjusted Beard's commission

13

after the fact.  Thus, genuine issues of material fact exist as to whether or not it would be unfair or unjust for IBM to retain the benefit Beard conferred on it.  Accordingly, IBM's motion for summary judgment as to Beard's unjust enrichment claim is **DENIED**.

### 5.    UNFAIR COMPETITION

California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200 *et seq*.  "An act can be alleged to violate any or all of the three prongs of the UCL — unlawful, unfair, or fraudulent."  *Berry v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).  In essence, the UCL "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (citation omitted).  Beard's complaint alleges violations of all three prongs of the UCL (Dkt. No. 1 at ¶ 65).

#### A.    UNFAIR AND FRAUDULENT PRONGS

Beard's UCL claim under the unfair and fraudulent prongs rely on his misrepresentation and unjust enrichment claims.  IBM moves for summary judgment on Beard's UCL claim under the unfair and fraudulent prongs because it argues that Beard's "claims for fraudulent and negligent misrepresentation and unjust enrichment fail" (Dkt. No. 78 at 22).  Because this order already held that genuine issues of fact exist with respect to those claims, IBM's motion for summary judgment as to Beard's UCL claim under the unfair and fraudulent prongs is **DENIED**.

#### B.    UNLAWFUL PRONG

In support of his UCL claim under the unlawful prong, Beard alleges violations of "California Labor Code Sections 200, 201, 202, 204, 221, 223, and 2751 and the applicable Industrial Welfare Commission Wage Orders" (Dkt. No. 1 at ¶ 66).   IBM moves for summary judgment on Beard's unlawful UCL claims predicated on all of the above alleged violations.

Beard "does not oppose [IBM's] motion regarding violations of Sections 200, 201, 202, and 204 of the Labor Code and violation of the Industrial Welfare Commission Wage Orders" (Dkt. No. 79 at 24).  Accordingly, this order **GRANTS** IBM's motion for summary judgment on

UCL claims premised on said Sections of California's Labor Code and the Industrial Welfare Commission Wage Orders. This order proceeds to analyze Beard's UCL claims under the remaining three sections of the California Labor Code: 221, 223, and 2751. [1]

### (i) Section 221 of the California Labor Code

Section 221 of the California Labor Code makes it unlawful for an employer "to collect and receive from an employee any part of the wages theretofore paid by said employer to said employee." "[A]n employee's 'wages' or 'earnings' are the amount the employer has offered or promised to pay, or has paid pursuant to such an offer or promise, as compensation for that employee's labor." *Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal.4th 217, 228 (2007) (emphasis omitted). While commission payments can qualify as wages for purposes of Section 221,"[t]he right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." *See Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313, 1329–30 (2006). Accordingly, Beard's Section 221 claim "requires some showing that he is contractually entitled to the commissions he claims to have been denied." *Kemp v. Int'l Bus. Machs. Corp.*, 2010 WL 4698490, at *6 (N.D. Cal. Nov. 8, 2010) (Judge Marilyn Hall Patel).

IBM's IPL explicitly states that it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it" (Dkt. No. 78-1, Exh. 6). Thus, Beard cannot show the contractual entitlement to commissions that is required to state a claim under Section 221. *See Kemp* (holding that the IPL is not a contract because it explicitly states that it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it" and dismissing the plaintiff's Section 221 claim); *Swafford v. Int'l Bus. Machs. Corp.*, 383 F.Supp.3d 916, 935 (N.D. Cal. April 17, 2019) (Judge Lucy H. Koh) (because the IPL is not a contract, the plaintiff's Section 221 claim failed "as matter of law"); *see also Gilmour v. Int'l Bus. Machs. Corp.*, 2009 WL 8712153, at *2 (C.D. Cal. Dec. 16, 2009) (Judge S. James Otero) ("[T]he Incentive Plan and Quota Letter did not create an enforceable employment contract").

---

[1] A prior order dismissed plaintiff's standalone claims under Sections 221, 223, and 2751 of the California Labor Code (Dkt. No. 51).

This order, therefore, **GRANTS** IBM's motion for summary judgment on Beard's UCL claim insofar as it is based on a violation of Section 221.

### (ii)    *Section 223 of the California Labor Code*

Under Section 223, "[w]here any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." As discussed above, the IPL is not a contract according to its own terms. Moreover, as IBM argues, the IPL does not designate a wage. *See Swafford* at 935 (holding that the plaintiff's Section 223 claim failed as a matter of law because the IPL is not a contract and because it does not designate a wage).

Accordingly, IBM's motion for summary judgment on Beard's UCL claim based on a violation of Section 223 is **GRANTED**.

### (iii)    *Section 2751 of the California Labor Code*

Under Section 2751(a), "[w]henever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid." In addition, an employer must then give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee. Cal. Labor Code § 2751(b). These requirements apply to the instant action because it is undisputed that IBM employed Beard and "the contemplated method of payment" involved commissions. IBM does not argue otherwise.

Instead, IBM argues that it complied with Section 2751 because the IPL is in writing, explains the manner in which commissions are calculated and paid, Beard signed it, and because IBM's HR department acknowledged it (Dkt. No. 78 at 24).

Beard responds by arguing that the IPL is not a contract, and that IBM failed to sign his IPL in violation of Section 2751. This order agrees.

Again, for reasons already discussed, the IPL is not a contract. Since Section 2751 requires a "contract" to satisfy its requirements, the IPL cannot do. *See e.g. Swafford*, 408 F.Supp.3d at 1153 (denying the defendant's motion for summary judgment on Swafford's Section 2751 claim

16

because the IPL was not a contract); *See also Piccarreto v. Presstek*, LLC, 2017 WL 3671153, at *2 (C.D. Cal. Aug. 24, 2017) (Judge Dolly M. Gee) (Section 2751 "requires that whenever an employer enters into a contract of employment with an employee, the employer must provide a *written contract* to the employee if the employee's payment involves commissions for services rendered in California"). Since this issue is itself dispositive, this order does not reach Beard's second argument regarding whether or not IBM's HR department's acknowledgment of the IPL constituted a signature under Section 2751(b).

Next, IBM argues that summary judgment should be granted because Beard lacks standing under the UCL. Specifically, it argues that Beard cannot show that its non-compliance with Section 2751 caused him economic injury. Perhaps IBM is right on this but the record falls short of precluding any and all forms of economic injury. A clear-cut contract, for example, would have saved both sides litigation expense. IBM's citation to *Schwarzkopf* v. *Int'l Bus. Machs. Corp.*, 2010 WL 1929625 (N.D. Cal. May 12, 2010) (Judge Jeremy Fogel), is inapposite. Not only had the plaintiff in *Schwarzkopf* not pled a Section 2751 claim, but the court did not even discuss UCL standing. Rather, the court granted summary judgment on the UCL claim because the plaintiff had no predicate claim to base it on. *Id*. at 15. That is not the circumstance here.

Accordingly, IBM motion for summary judgment on Beard's UCL claim insofar as it is based on a violation of Section 2751 is **DENIED**.

### 6. RACE DISCRIMINATION CLAIM UNDER FEHA

Beard argues that IBM discriminated against him on the basis of race in violation of California's Fair Housing and Employment Act. For claims of discrimination in violation of FEHA, California law utilizes the burden shifting framework the Court elucidated in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354 (2000). Under this framework, a plaintiff must first raise a prima facie case of employment discrimination. If a plaintiff establishes a prima facie case, "[t]he burden of production, but not persuasion, then shifts to employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Uni. Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). If a defendant meets this burden, the plaintiff must

then "introduce evidence sufficient to raise a genuine issue of material fact" as to whether the defendant's proffered reasons for its challenged action are mere pretext for unlawful discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).

A plaintiff may establish a prima facie case based on either direct evidence of racial discrimination, or based upon circumstantial evidence by showing that: (1) he belonged to a protected group; (2) he was qualified; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of plaintiff's group were treated more favorably, "or other circumstances surrounding the adverse employment action give rise to an inference of discrimination giving rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

### A. DID BEARD ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION?

As a threshold matter, IBM argues that Beard cannot establish a prima facie case. It is undisputed that as an African-American, Beard is a member of a protected class. Further, IBM does not challenge Beard's qualification, nor that he suffered an adverse employment action. Rather, it argues that the two white IBM employees — Donato and Beroza — which Beard compares himself to as circumstantial evidence of race discrimination were not similarly situated employees who were treated more favorably (Dkt. No. 78 at 12). Specifically, IBM argues that because Mulada did not make the decision with respect to Donato and Beroza's commissions, and because the HCL deals were different from the deals closed by Donato and Beroza in that that HCL ESA deals were both part of larger deals, Beard and his white comparators are not similarly situated.

IBM rests on the broad proposition that if a plaintiff and his comparators have different supervisors, that alone, precludes the plaintiff and his comparator(s) from being similarly situated (*id.* at 12–13) (citing *Bosnak v. City & Cnty. of San Francisco*, 2017 WL 4641908, (N.D. Cal. Oct. 16, 2017) (Magistrate Judge Marina-Elena James); *Anderson v. City & Cnty. of San Francisco*, 169 F.Supp.3d 995, (N.D. Cal. Mar. 14, 2016) (Judge Donna M. Ryu); *Alvarado v. Fedex Corp.*, 2005 WL 2036026, (N.D. Cal. Aug. 23, 2005) (Judge Susan Illston).

United States District Court
Northern District of California

Not so. Each of these decisions cited by IBM involved at least one more dissimilarity between the plaintiffs and their comparators in addition to different supervisors. Aside from these decisions being distinguishable, they are also not binding. [2]

No court in this district has held that individuals with different supervisors can never be comparators. Rather, employees are similarly situated:

> when they have similar jobs and display similar conduct. The employees need not be identical, but most be similar in material respects. Materiality depends on context and is a question of fact that cannot be mechanically resolved.

*Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011) (citations and quotations omitted).

For the reasons stated below, this order holds that Donato, but not Beroza, was similar to Beard in material respects and thereby similarly situated for purposes of raising a prima facie case, or so a jury could find.[3]

At least with respect to Donato, Beard has shown that Donato was a similarly situated employee outside of his protected class whom IBM treated more favorably, or so a jury could reasonably find. *First*, like Beard, he worked as an ESA sales representative. *Second*, he had the same second and third-line managers as Beard. *Third*, he had a similar commission plan to Beard. And *lastly*, he closed a large deal in 2017 which also had to be approved by two of the same line managers as Beard. Unlike Beard, however, once his line managers approved his sales achievement, IBM paid Donato in full. Indeed, Kingston testified that IBM paid Donato $1.6 million for the SAS deal. Because IBM reduced Beard's commission on the HCL deals

[2] In *Bosnak*, the plaintiff was a cook whereas his comparators were food service workers. In *Anderson*, the plaintiff failed to adduce any facts showing that she and her comparators engaged in similarly serious conduct. In *Alvarado*, the plaintiff's comparator was not promoted over her and there was a considerable gap in time in the situations being compared. The similarly situated determination in these decisions, therefore, involved much more than just different supervisors.

[3] In addition to Donato and Beroza, Beard's opposition brief also points to "individuals who had their commissions reviewed on the HCL deals at issue" as similarly situated comparators. IBM argues that plaintiff did not raise these individuals until now and therefore they should be barred by FRCP 37(c)(1) considering Beard did not supplement his relevant interrogatory response. At oral argument, however, IBM admitted that out of all the commission employees who worked on both HCL deals, it only reduced Beard's commissions. Thus, while these individuals are not considered for the purpose of evaluating whether or not Beard has established a prima facie case, IBM's admission is probative of pretext, as will be discussed below.

whereas it did not reduce Donato's commission, a jury could find that IBM — albeit not Mulada specifically — treated a similarly situated white employee more favorably.

Given that "[t]he proof required to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence[,]'" this order holds that Beard has carried his burden in raising a prima facie case of racial discrimination, thereby shifting the burden to IBM to provide a legitimate non-discriminatory reason. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir. 2006).

### B.    HAS BEARD SHOWN "PRETEXT?"

The second question under *McDonnel Douglas* is to determine whether or not IBM met its burden in showing a legitimate non-discriminatory reason for the adverse action. This order will assume *arguendo* that IBM did so, thereby shifting the burden back to Beard to show that IBM's reason is mere "pretext" for discrimination. In *Noyes v. Kelly Services*, 488 F.3d 1163, 1170 (9th Cir. 2007), the Ninth Circuit held (emphasis in original):

> "[A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the employer." "All of the evidence [as to pretext]—whether direct or indirect—is to be considered cumulatively." Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present "specific" and "substantial" facts showing that there is a genuine issue for trial. However, that requirement is tempered by our observation that, in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is "hardly an onerous one."

As to its legitimate non-discriminatory reason, IBM asserts that it reduced Beard's commissions because Mulada considered the deals "unique," and he wanted to ensure that IBM paid Beard an amount commensurate with his contribution to the deals.

Although Beard testified generally that he has always felt that he was treated differently because of his race, his opposition focuses on indirect evidence of pretext only. Namely, he argues that IBM's explanation is unworthy of credence because (1) its reasons "shifted" and because (2) uniqueness isn't a "proper basis to cap Beard while paying every other employee who worked on the HCL deals in full" (Dkt. No. 78 at 17). For the reasons stated below, this

order finds that Beard has adduced "specific" and "substantial" facts to show that IBM's proffered explanation reason is unworthy of credence because it is "internally inconsistent," or so a jury could find.

*First*, as IBM admitted at the oral hearing, out of all the commission employees who worked on the HCL deals, IBM only reduced the commissionable revenue to Beard. For instance, with respect to the 3Q HCL deal, IBM did not reduce the commissionable revenue to Pearson even though IBM's asserted justification for reducing Beard's commission — uniqueness of the deal — applied with equal force to Pearson. Nonetheless, Mulada only reduced Beard's commission. IBM points to the fact that Beard remained the highest paid commission employee even after the reduction as evidence that it did not discriminate. While it is true that Beard remained the highest paid commission employee on both HCL deals even after the reductions, a jury could still find that the reductions themselves were discriminatory since IBM did not reduce the commissions of any other employees who worked on the deals. Though it may be true that Mulada only reduced Beard's commission because only Beard stood to get too large a commission payment, and not because of Beard's race, a jury could find that Mulada's targeting of Beard involved discriminatory animus; especially since the evidence shows that Beard's commission amount "upset" Mulada, and because Mulada also reduced Beard's commission on the 4Q HCL deal despite having no personal involvement on that deal.

*Second*, IBM's asserted justification that it wanted Beard's commission to be commensurate with his contribution on the deals is questionable, particularly with respect to the 4Q HCL deal. Mulada testified that he examined various factors in evaluating Beard's contribution to the deals in ultimately deciding to reduce the commissionable revenue to Beard from $12.6 to two million dollars. While Mulada's testimony may pass muster with respect to the 3Q HCL deal, a jury could easily find that it does not hold water with respect to the 4Q HCL deal. Notably, IBM informed Beard that his commission on the 4Q HCL deal would be reduced in the same manner as the 3Q HCL deal in January 2017, a month before the 4Q HCL deal closed in late December. Accordingly, Mulada's contention that he based his decision to

flow only two million dollars with respect to the 4Q HCL deal on Beard's contribution, is undermined by the fact that the decision was made in advance of the completion of Beard's contribution to that deal. Moreover, unlike the 3Q HCL deal, the 4Q HCL deal did not even involve Mulada's participation. Nonetheless, he still intervened to reduce Beard's commission, but not anyone else's. Furthermore, Mulada testified that over the span of his career with IBM, he had only once before intervened to reduce someone's commission. Given these facts, a jury could find support for Beard's assertion that Mulada targeted him because of his race.

*Third*, a jury could also find IBM's asserted justification for reducing Beard's commissions — uniqueness of the HCL deals — unworthy of credence. IBM's employees' testimony indicate that they believed the HCL deals were unique because they either involved a NDA and/or were both part of larger deals. It is undisputed, however, that the 4Q HCL deal did not involve a NDA. Moreover, Beard testified that he had worked on large deals before, even deals that involved IPP, and yet his commissions had never before been reduced. Accordingly, a jury could find that IBM's asserted legitimate non-discriminatory reasons are "internally inconsistent[,]" unworthy of credence, and thereby pretext for discrimination. *See Noyes*, 488 F.3d at 1170.

Accordingly, this order holds that Beard has met his burden to show pretext. For these reasons, IBM's motions to for summary judgment on Beard's FEHA discrimination claim is **DENIED**.

### 7. EQUAL PAY

Section 1197.5(b) of California's Labor Code requires Beard to show that IBM paid him less than its non-African-American employees for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." If Beard is able to carry this burden, the burden then shifts to IBM to show that the wage differential was due to a seniority system, a merit system, a system that measures earning by quantity or quality of production, or a non-race-related bona fide factor. *Ibid.*

Beard again relies on Donato and Beroza to raise a prima facie case for his equal pay claim. He argues that IBM paid him less than his Caucasian counterparts for substantially similar work on similar deals. Beard, however, fails to adduce sufficient facts surrounding the skill, effort, responsibility, and working conditions of the SAS and Deloitte deals. Significantly, Beard testified that he did not speak to anybody regarding the details of the SAS and Deloitte deals. For instance, Beard admitted that he had not discussed and had no personal knowledge of the complexity, post-closing activity, or daily work hours Beroza and Donato expended on their deals; Beard also had no personal knowledge about whether or not Beroza and Donato had to travel like he did on both HCL deals.

This order, therefore, holds that Beard has failed to raise a prima facie case and thereby **GRANTS** IBM's motion for summary judgment on Beard's Equal Pay Claim.

## CONCLUSION

For the reasons stated in this order, IBM's motion for summary judgment in **GRANTED IN PART AND DENIED IN PART.**

- The motion for summary judgment on the fraudulent misrepresentation claim is **DENIED**;
- The motion for summary judgment on the negligent misrepresentation claim is **DENIED**.
- The motion for summary judgment on the unjust enrichment claim is **DENIED**.
- The motion for summary judgment on the UCL claim based on the unfair and fraudulent prongs are **DENIED**.
- The motion for summary judgment on the UCL claim based on the unlawful prong to the extent it is predicated on violations of California Labor Code §§ 200, 201, 202, 204, 221, 223 and violations of the Industrial Welfare Commission Wage Orders is **GRANTED**;
- The motion for summary judgment on the UCL claim based on the unlawful prong to the extent it is predicated on a violation of Californian Labor Code § 2751 is **DENIED**;

- The motion for summary judgment on the FEHA discrimination claim is **DENIED**;
- The motion for summary judgment on the California Labor Code § 1197.5 claim is **GRANTED**.

There will, please, be no more summary judgment motions, including those masquerading as motions in limine.

**IT IS SO ORDERED.**

Dated:  April 9, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE